General Wholesale Company, a Corporation, and Service Truck Rental, Inc., a Corporation, Plaintiffs-Appellants, v. Illinois Central Railroad Company, Defendant-Appellee.

Gen. No. 10,279.

Third District.

May 18, 1960.

Costigan, Wollrab, and Yoder, of Bloomington, for appellants.

Chalmer C. Taylor, of Bloomington, and Robert S. Kirby, of Chicago (Joseph H. Wright and Herbert J. Deany, of counsel) for appellee.

REYNOLDS, P. J.

This is a suit for damages occasioned by the collision of an Illinois Central Railroad Company train with a tractor-trailer at the railroad crossing on Route No. 150 at LeRoy, Illinois. The collision occurred on the 26th day of February 1957, at about 12:45 o'clock p.m. The weather was cold, there was a slight fog and a drizzle of rain. The driver of the truck involved had his windshield wipers going and his clearance lights on. The truck approached the crossing from the north, coming out of a curve to the crossing. This curve is some 600 feet or more from the crossing, and from there to the crossing the highway is straight and level. There was a standard highway railroad warning sign some five to six hundred feet north of the crossing, and the usual cross-buck railroad sign about fifteen feet north of the crossing on the west side. The driver of the tractor-trailer testified he did not see the highway warning sign but did see the cross-buck sign. The testimony of the witnesses varies as to speed but apparently neither the tractor-trailer nor the train was traveling at over 20 miles per hour. The train struck the tractor-trailer, turned it over, and damaged the tractor-trailer and the merchandise in the trailer.

One plaintiff, General Wholesale Company, sued to recover for damages to the cargo, claiming negligence on the part of the railroad. The other plaintiff, Service Truck Rental, Inc., sued for damages to its tractor and trailer, claiming the railroad was negligent. The case was tried before a jury and the jury returned a verdict finding the defendant, the Illinois Central

Railroad Company, "not guilty." At the bottom of the jury verdict, the jury recommended the installation of flashing lights at the intersection. Judgment was entered on the verdict, the post trial motions of the plaintiffs were denied, and the plaintiffs appeal to this court.

The appeal presents four points which the plaintiffs rely upon for reversal. 1. That the verdict of the jury and the judgment entered thereon was manifestly and palpably against the weight of the evidence as to each of the plaintiffs. 2. That any alleged negligence of Dale Crane, driver of the tractor, as agent of General Wholesale Company as bailee, cannot be imputed to Service Truck Rental, Inc., bailor of the tractor and trailer. 3. That the Court erred in giving Defendant's Instructions Nos. 8, 10, 11 and 14, and in refusing to give Plaintiff's Instructions Nos. 3, 4, 5, 7, 8 and 10. 4. That the finding of the jury of the need for flashing lights at the intersection in question was a special finding inconsistent with the general verdict and other issues of the case.

In passing on these questions, the primary question is whether the railroad company was negligent. If the defendant railroad company was not negligent the question of a bailor-bailee relationship between the plaintiffs is academic and this court need not consider it. If there is no negligence on the part of the defendant it is immaterial whether the negligence, if any, of the driver of the tractor-trailer could be imputed to the bailee but not the bailor. Any instruction involving this question must of necessity rest upon such negligence of the railroad, and if there was no negligence on the part of the railroad, the refusal of such instruction is proper.

The driver of the tractor-trailer did not see the train until he was on the tracks and did not hear any whistle or bell. It was a wet, rainy day and he had

168

his clearance lights on and his windshield wipers working.

Lester Moss, operator of a service station about 65 feet north and 65 feet east of the crossing, was in his grease room and heard the train whistle for the street crossing east of the station, which was about one and one-half blocks east of the point of collision. This witness did not hear the bell on the train ringing at any time although he admitted it could have been ringing and he didn't hear it. He saw the tractor-trailer passing his front door, about 100 feet from the crossing, and thought he saw the driver glance to the east when he was opposite the garage door of his station. The first time he saw the train was when it was about 8 or 10 feet from the point of impact. He thought the driver of the tractor-trailer slowed to two or three miles per hour, but he didn't observe any skid marks on the pavement.

Roscoe Bailey, was driving on the highway, approaching the crossing from the south. He didn't hear any whistle blown, but heard the bell ringing when he was some fifty or seventy-five feet from the crossing. He stopped about thirty feet from the tracks.

Clarence Mayer, a resident of LeRoy, Illinois saw the accident. He saw the train about half a block away, some 200 or 250 feet from the crossing. He did not hear any bell or whistle prior to the accident, but testified that his granddaughter had turned his car radio on loud, just before he got to the intersection; that he turned the radio down when he first saw the train and from that time on he heard no bell ringing or whistle blowing. There was a car ahead of him, which he learned was that of the witness Roscoe Bailey.

Kenneth Moss, brother of Lester Moss, was in the filling station repairing a carburetor. The doors were closed but he heard the train whistle, describing the

169

whistle as shrill and piercing. He didn't hear any bell ringing.

Rolley O'Neal was about 1,000 feet west of the crossing. He was expecting a load of fertilizer on the train and was standing in the door of his employer's shop when he heard the train whistle for the crossing. He didn't see the collision but heard it. He heard the whistle blowing until the time of the crash.

Paul Kingdon, agent for the defendant railroad testified that as he sat in the railroad station he heard the train whistle for the crossings in LeRoy. He did not hear the crash.

Harvey Kaler, conductor on the train testified he was in the caboose of the train, which consisted of the engine, two box cars and the caboose. He heard the engineer whistle for each crossing in LeRoy. He said the speed of the train decreased from 20 to 10 miles per hour at the east crossing in LeRoy, and that as the engine approached Route 150 the whistle was blowing and the emergency brakes were on. This conductor talked with Crane, the tractor-trailer driver and Crane told him he did not see the train. Mr. Kaler heard the whistle for the crossing just back of the crossing immediately east of the Route No. 150 crossing and estimated the distance between the crossings at 400 feet. He heard the whistles, four in number and said the engineer used a four whistle signal for each crossing.

Maurice Decker, the brakeman of the train, was in the engine. This witness testified that the engineer turned on the bell, which rings automatically, when the train came into LeRoy. He heard the engineer whistle for each crossing and for the crossing of Route No. 150, and that he was standing up getting ready to put on his raincoat just before the collision. He saw the tractor-trailer when it was only about 15 feet from the crossing. The fireman told him that the tractor-

trailer was not going to stop and about that time the engineer put on the emergency brakes. When he first saw the tractor-trailer, the engine was about 30 feet from the crossing and the whistle was blowing.

H. J. McDonald, engineer on the train, testified that he turned on the bell and slowed down as they approached LeRoy from the east. Up to that time the train was traveling at a speed of 20 miles per hour. He signalled for each of the crossings in LeRoy, with two long whistles, a short one and then a long one. He testified that he signalled for the crossing at Route No. 150, just after he passed the first street east of the state route. He saw a car coming from the south and thought for a moment that it was not going to stop but it did stop about 30 feet from the crossing. He did not see the truck until after the collision. Mr. McDonald testified he had been an engineer for 32 years and estimated it would take 100 to 125 feet to stop a train of the type involved in the accident, traveling at a speed of 8 to 10 miles per hour. He estimated that the engine was about 60 feet across the pavement when the train stopped. This witness testified that his headlight was burning both before and after the collision.

Charles Weeks, the fireman testified he was sitting in the cab of the engine on the north side and that his duties were to check to see if there is any traffic approaching and report to the engineer. He corroborates the testimony of the others as to the decreasing of speed, the rate of speed of the train, the blowing of the whistles for each crossing and the ringing of the bell. He first saw the tractor-trailer when it was about 500 feet·from the crossing. He called to the engineer but the whistle was blowing and he did not know whether the engineer heard him. There was a filling station on the corner that obstructed his view, and when he next saw the truck it was about 100 feet

171

from the crossing and the train was about 50 feet. He estimated the speed of the truck at 20 miles per hour. He then yelled to the engineer to "shoot the bill" which means put on the emergency brakes, and that the engineer applied the emergency brakes and blew his whistle.

Referring again to the testimony of the driver of the tractor-trailer, Mr. Dale Crane, he testified he did not see the highway sign for the railroad crossing until after the accident. He described this sign as a small rusty sign not capable of being seen. A picture taken the next day shows that the sign was not small or rusted and was plainly visible. (Defendant's Exhibit "A".) It was about 600 feet north of the crossing, and about 6 to 8 feet west of the highway slab. It appears to be approximately two feet across, is circular with a cross on the face and the letters R. R. on the top half of the circle. Crane said he slowed down coming out of the curve from the north to about 10 to 12 miles per hour. When he was 125–150 feet north of the crossing he looked in both directions and saw no train. He heard no whistle or bell. The first time he was aware there was a train was when he was half way across the tracks. He had looked when he was about 25 feet from the crossing, this being the second look and he didn't see or hear anything. There was nothing to interfere with his vision toward the left.

The testimony of all the witnesses shows that there is general agreement as to the speed of the train, and the tractor-trailer which was between 8 and 20 miles per hour. The location of the Moss Filling Station, at the northeast corner of the crossing is fairly well established as some 65 feet north and 65 feet east of the crossing. This station is an obstruction to the view of persons approaching from the north on the highway as to trains from the east, and an obstruction to the

view of the train crew approaching from the east on the railway as to vehicles approaching from the north. Plaintiff's Exhibit No. 23, an aerial photograph shows a tree near the crossing, but this would be no impediment to view since the date of the collision was February and there would be no leaves on the tree at that time. There was a picket fence, sloping downward from the filling station building to about three feet high, nearest the railroad, ending about 30 feet from the tracks. This picture shows that both the train crew and the drivers of vehicles coming from the north, would have an unobstructed view of each other for at least 125 and possibly 150 feet each way, north or east.

 A railroad operates on a privately owned right-of-way. Generally, a train on the railroad has the right-of-way at crossings. The law imposes upon the railroad certain duties. It must maintain crossing signs, such as the cross-buck signs testified to here, at every crossing of a street or road. At busy crossings, in many instances signal lights and gates, or both are maintained, for the protection of the public using the crossing. The Illinois Commerce Commission may, in its discretion, require such lights, gates and other safety devices as it deems necessary. Engines are required to be equipped with bell and whistle and one of these warning devices must be operating at least 80 rods before each crossing. If the railroad fails to use any of these warning devices required of it by law, it is ipso facto guilty of negligence in case of a collision with a vehicle or truck. It has the right-of-way, it operates on its own tracks, yet, in order to protect the lives and property of persons using the highways or streets at the crossings of the railroad, the railroad must observe these safety precautions, and if it fails to do so, it is guilty of negligence. Thus, in this case, several factual questions are presented. Was

173

the bell ringing or the whistle blowing as testified? Or, was one of these warning devices being operated? Was there at the crossing at the time of the accident, the warning signs as required by law? The verdict of the jury finding the railroad "not guilty" of negligence answers these questions in the affirmative. Without proof of negligence on the part of the railroad, the question of contributory negligence on the part of the driver of the tractor-trailer is not at issue, although the evidence here is fairly conclusive that Crane, the driver of the tractor-trailer was guilty of contributory negligence. Our courts have held many times that a person can not say he looked and did not see the train, when had he looked he would have seen it. Dee v. City of Peru, 343 Ill. 36, 174 N. E. 901; Greenwald v. Baltimore & O. R. Co., 332 Ill. 627, 164 N. E. 142; Holt v. Illinois Cent. R. Co., 318 Ill. App. 436, 48 N.E.2d 446; Tucker v. New York, C. & St. L. R. Co., 12 Ill.2d 532, 147 N.E.2d 376. Here the driver of the tractor-trailer testified he look both to the left and right when he was about 100 feet from the crossing and saw nothing. He looked again, his second look, when he was about 25 feet from the crossing, and saw nothing. Yet within some 40 to 50 feet from him was a train, standing some 14 feet high, with bell ringing, whistle blowing and headlight lit. As said in the case of Tucker v. New York, C. & St. L. R. Co. case, the law will not permit such an absurdity.

■ A large part of the brief of the plaintiffs concerns the question of bailment of the cargo in the trailer, it being contended that contributory negligence of the driver is not attributable to the bailor. This court is not convinced that the relation of bailor-bailee existed in this case, but it is unnecessary for this court to pass on this question since the primary question was the question of negligence on the part of the railroad. This, a factual question was decided by the

jury and this court and our Supreme Court has said many times that the decision of a jury on a question of fact will not be disturbed by the reviewing court unless manifestly and palpably against the weight of the evidence, or unless negligence appears as a matter of law. Koch v. Lemmerman, 12 Ill.App.2d 237, 139 N.E. 2d 806; Ashby v. Irish, 2 Ill.App.2d 9, 118 N.E.2d 43; Hanck v. Ruan Transport Corp., 3 Ill.App.2d 372, 122 N.E.2d 445. Where the evidence is conflicting the court will not substitute its judgment for that of the jury. Schneiderman v. Interstate Transit Lines, Inc., 394 Ill. 569, 69 N.E.2d 293. Here the evidence is conflicting and this court cannot say that the verdict of the jury is manifestly and palpably against the weight of the evidence. This disposes of points Nos. 1 and 2 of the plaintiff's brief. It also disposes of Plaintiff's Instructions Nos. 3, 4 and 7, since these instructions involve bailment.

■ The plaintiffs claim error in refusal of the trial court to give Plaintiffs Instruction No. 8 but the abstract shows this instruction was given. As to Plaintiffs' Instruction No. 10, which was refused, the plaintiffs do not argue this point in their brief. It may be that the trial court considered this instruction as one involving bailment and refused it for that reason. We see no reason for the refusal of the instruction, but the refusal to give it is not reversible error since the matter was covered by other instructions given for the plaintiffs.

■ Plaintiffs also assign error in the giving of Defendant's Instructions Nos. 8, 10, 11 and 14. Instruction No. 8 involved the alleged contributory negligence of the driver, Dale Crane. Instruction No. 10 involved the alleged contributory negligence of one of the plaintiffs, General Wholesale Company, and Instruction No. 11 involved the alleged contributory negligence of the other plaintiff, Service Truck Rental,

175

Inc. We see no reason for the giving of Instruction No. 8, as to the driver, since the agency of the driver could have been included in the separate instructions as to each of the plaintiffs, namely Nos. 10 and 11, but we do not regard the giving of the instruction as reversible error. Since there were two plaintiffs, the plaintiffs here can hardly complain that an instruction as to each of them is repetitious and therefore objectionable. Instruction No. 14 of the defendant is an instruction of due care on the part of the driver and although the plaintiffs claim that this instruction makes an assumption of a fact, namely that the truck driver voluntarily placed himself in a position of danger without there being any evidence to support such an assumption, a reading of the instruction does not bear out this contention. The instruction is not peremptory in form, and this court cannot say it was prejudicial to the cause of the plaintiffs or that it is reversible error. There is evidence to show that the driver looked and did not see when he could have seen, and that he drove his tractor-trailer over the crossing in the path of an approaching train. The instruction merely instructs the jury that the railroad employees operating the train had the right to assume that he would act as a reasonably cautious and prudent person would act under the same or similar circumstances.

■ The last point urged is that the recommendation of the jury for flashing lights at the crossing was a special finding inconsistent with the general verdict and the other issues of the case. The language of this recommendation was in the following language: "We, the members of the Jury, would like to recommend the installation of flashing lights at the intersection in question. On the basis of testimony heard, we feel that this would be a definite improvement and to the benefit of all concerned." This recommendation

176

would doubtless apply to every railroad crossing, yet a reading of the language of the recommendation fails to disclose any special finding as to any issue in this cause. There was no finding at variance with the verdict of "not guilty." It was at its best or worst, only a recommendation of the jury, and can only be treated as surplusage. Only one Illinois case is cited, that of Gross v. Sloan for Use of Blatchford, 54 Ill. App. 202, which held that a verdict must respond to the issue, or it will be bad. That is undoubtedly true, but here the verdict did respond to the issue, namely the negligence charged against the defendant, and the recommendation of the jury did not respond to the issue. Both the plaintiffs and the defendant cite 53 American Jurisprudence, Section 1038, page 718. The language there is as follows: "Where the jury find not only the issue, but also matters not embraced therein, the latter will be rejected as surplusage, and if after this a verdict is left which is in all respects complete and responsive to the charge, it is sufficient."

For the reasons stated, the judgment for the defendant will be affirmed.

Judgment affirmed.

CARROLL and ROETH, JJ., concur.