(No. 39220.-

The People of the State of Illinois, Appellee, *vs.*
Thomas Durso *et al.,* Appellants.

*Opinion filed May 29, 1968.—Rehearing denied Sept. 24, 1968.*

WARD, J., took no part.

ROBERT E. CLEVELAND and ARTHUR J. O'DONNELL, both of Chicago, for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE, JOEL M. FLAUM and JAMES B. ZAGEL, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

In a jury trial in the circuit court of Cook County, defendants, Thomas Durso and Michael Gargano, were convicted of the murder of Anthony Moschiano on January 21, 1964. They were sentenced to the penitentiary for a term of not less than 100 nor more than 150 years.

Anthony Moschiano was a narcotics addict. His body was found in the Des Plaines River on April 14, 1964, and cause of death was established as a stab wound of the left lung and aorta inflicted by a sharp-edged instrument suf-

ficiently broad to cause a 2¼-inch laceration. It is the State's contention that the decedent was killed by defendants for failure to account to them for the proceeds of narcotics which they had given him to sell and also because they suspected him of being an informer.

To prove the murder and the motive 39 witnesses were presented, many of them narcotics addicts, many of them police officers or Federal agents assigned to narcotics detail. Chief among these witnesses was Leonard Fiorenzo, an addict of long standing, an informer, and a criminal with a number of convictions against him. He first connects the defendant with the decedent, Moschiano, on January 8, 1964. On that day Durso picked up Fiorenzo in a yellow Pontiac and inquired as to the whereabouts of Moschiano, stating that he knew Fiorenzo had been with him the last four or five days, that Fiorenzo didn't know how much trouble he was in, that his life depended on finding Moschiano. They drove to Moschiano's home but no one answered Durso's knock either at the front or back door. Durso told Fiorenzo that he had given Moschiano a lot of heroin to sell for him and he hadn't seen him for four or five days. Fiorenzo told Durso that anything he got from Moschiano, he paid for.

According to Fiorenzo, he and Durso then drove to a restaurant and picked up defendant Gargano. Both Gargano and Durso carried guns. The three of them then drove to Nancy Bourne's house where John Melkonian lived. The latter was another addict and longtime friend of Fiorenzo and the decedent. Lupe Constabile, a girl friend of the decedent, also lived there. Durso pushed his way into the house and forced Mrs. Bourne to take him to Lupe's room upstairs. Gargano stayed downstairs with Fiorenzo but Fiorenzo heard a lot of noise from upstairs as the room was ransacked and he also heard Durso yelling and telling Mrs. Bourne to shut up or he would blow her head off. When the two came back down he made Mrs. Bourne call a number and ask for Tony. Then Durso took the phone

and told him to get Moschiano out on the street in ten minutes or somebody would get hurt. Gargano then went out and brought Moschiano back. Durso asked where Moschiano had been for the past four or five days, why he hadn't been in touch with him, where the stuff was and if he had sold any. Moschiano said that he had about $500 for the stuff he had sold and he took out a brown paper bag to show Durso what he had left. Durso removed the plastic bag from the brown bag, felt it and said that that was about right.

Durso then handcuffed Fiorenzo and Moschiano together, made them lie down in his car, and in about 10 or 15 minutes they stopped at a garage. They were told to remain in that position and they did so for 1½ hours until Durso came back and told them he had decided to give them a pass this time, a chance to make some money selling the stuff though he didn't know why as everyone had told him Moschiano was a stool pigeon. It was decided that the stuff was worth about $2000 and that it would take about two weeks to sell, and that Fiorenzo would help. Durso told Moschiano to bring him the $500 the next morning.

On that same day, January 8, Fiorenzo and Moschiano rented a room at the Cass Hotel and split a portion of the heroin into 200 small packages. They then rented a room at the Ontario Hotel and made approximately 50 larger packages and left the stuff there, padlocking the outer door. The next morning, January 9, Fiorenzo gave another addict, Viot Cancialosi, 20 packages to sell and each day until January 14 gave him additional packages, finally receiving $200 from Cancialosi. On January 14 Fiorenzo called Moschiano and left $175 at Jimmy Green's tavern to be picked up by Moschiano. Fiorenzo and his friend, Melkonian, then went to the police station to turn themselves in to Detective Brown, for whom both Moschiano and Fiorenzo had been serving as informers. They were con-

fined in the witness quarters of the State's Attorney for the next six days until January 20.

On their release from the witness quarters they spent the night at the Eagle Arms Hotel and on January 21 Fiorenzo ran into Durso at Jimmy Green's tavern. He told Durso he had been arrested for petty theft and had been confined for six days. He asked Durso if he had got the money he had left with Jimmy Green and Durso said Moschiano had never mentioned it to him. They checked with Jimmy Green and he told them Moschiano had picked it up within 10 minutes after Fiorenzo had left it. Durso said that Moschiano had told him that the padlock had been broken off the door at the Ontario Hotel and the stuff left there had been stolen. (Actually a Federal narcotics agent had picked up the "stuff" on January 14 after having talked with Moschiano and had identified it as 97 grams and 80 milligrams of heroin.) Durso said that Moschiano had told him he could make a kilo sale to a colored fellow on the south side and he would make it up to him. Durso then had Fiorenzo pick up Moschiano in the yellow Pontiac and the three of them headed to what was later identified as Durso's house. On the way Durso asked Moschiano about the $175, and he said he had it together with some other money which he would give him all at once. Durso had asked about the stuff that had been taken and Moschiano told him about the prospective kilo sale, but Durso said he wanted no part of that sale.

When they arrived at Durso's house Gargano was there and he too questioned Moschiano about the missing stuff. To Moschiano's plan to make good on a kilo sale Gargano said he could hardly be trusted with $15,000 when he had failed with $2000. Moschiano then proposed to pay them back at $200 a week from money obtained as a thief. At this time a Sears truck drove up and Durso called to his wife that her humidifier was here. Durso and Gargano then

took Fiorenzo and Moschiano to the garage where the trunk of the yellow Pontiac was open and covered with papers on the floor and all sides. Fiorenzo was told to get in the back seat and Moschiano was handcuffed with his hands behind his back. Gargano shoved some rags in Moschiano's mouth and Durso tied a rag around his mouth. Moschiano vainly pleaded not to be put in the trunk. From his position in the back seat Fiorenzo stated he could see through the crack between the raised trunk lid and the chassis of the car and saw Durso stab downwards with a hunting knife and after a wiggling motion he could hear a gurgling sound. The knife was a hunting knife, with about a 6-inch blade, 1½ inches wide and a 4-inch handle.

When Durso told Fiorenzo to get out of the car he saw Durso wiping his hands off on some rags, and Moschiano was in the trunk with blood over the front of his T-shirt and up around his face and neck. Durso told Fiorenzo he was going to let him off and that Fiorenzo could make some money selling stuff. Durso took some gloves and money from Moschiano's pockets and told Fiorenzo to look, that "this is what happens to stool pigeons and to people that short me."

Fiorenzo was then warned not to say anything and Gargano took him to the L station so he could go back to his neighborhood. He immediately called the narcotics section at police headquarters but didn't report the crime. The next morning, accompanied by his friend, Melkonian, he went to the narcotics section and in substance gave the above account to a group of officers.

We do not believe it necessary to detail the testimony of the array of witnesses presented by the State to support and confirm Fiorenzo's detailed account of his activities and meetings with defendants prior to the murder. Suffice it to say that at least one or more witnesses were presented to confirm the possession of the brown paper bag by Moschiano, the use of some of its contents by friends

of Moschiano, each meeting of Durso with Fiorenzo, whether on the street, in the yellow Pontiac, or at Jimmy Green's tavern, the visit to Moschiano's home by Durso and Fiorenzo, the visit to Mrs. Bourne's home by Durso, Gargano and Fiorenzo, and all the events that occurred at that time, including Moschiano being picked up by Gargano, handcuffed to Fiorenzo and taken away, and the verification by Jimmy Green that Fiorenzo had given him $175 which Moschiano had later called for.

In addition, Lupe Constabile testified that sometime around Christmas, 1963, she, Durso and Moschiano had ridden in the yellow Pontiac to make a contact for a sale which fell through, that Moschiano had a brown paper bag with him and pleaded with Durso to allow him to sell it on the street, asking if his life wasn't worth it to give him that chance. Several agents and police officers testified as to the discovery of the heroin in the Ontario Hotel on January 14, as to seeing Durso and Moschiano together on January 15, and Durso, Moschiano and Gargano together on January 20 in the yellow Pontiac. A truck driver testified he delivered a humidifier to Durso's home about 2:30 P.M. on January 21. A used-car-lot owner testified and identified a yellow Pontiac as one he purchased from Durso on January 27. And the body found in the river on April 14 was identified as Moschiano by his fingerprints, and the clothing on the body was the same as that described by Fiorenzo. No incriminating evidence was found in the trunk of the car.

Neither Durso nor Gargano testified in his own defense.

Defendants first contend that they were denied a fair trial in that the State concealed a pretrial statement by Mrs. Bourne, the contents of which were favorable to defendants. At the trial defendants requested any previous signed statement made by Mrs. Bourne and they were furnished with a 6-page statement dated January 23. The report allegedly withheld was an unsigned police report dated Janu-

ary 18 containing a description of the two men who had pushed their way into Mrs. Bourne's house on January 8. This report is couched in abbreviated police phraseology and was brought to the attention of the court and the State's Attorney for the first time on defendants' motion for a new trial. The law is well settled that a defendant is entitled to a previous statement of a witness to be used for impeachment purposes, but the requirement applies only to specific statements which have been established to exist and which are in the witness's own words or substantially verbatim. (*People* v. *Neiman*, 30 Ill.2d 393; *People* v. *Wolff*, 19 Ill.2d 318.) Also it is essential that a preliminary foundation be laid showing the existence of the statement, and where the defense fails to interrogate the police regarding the statement the mere unverified statement of counsel in a colloquy during the trial is insufficient to establish its existence. (*People* v. *Golson*, 37 Ill.2d 419.) Here there is even some doubt that the police report constitutes a statement of the witness. It is not signed by her, nor specifically attributed to her, and being only a physical description of two men it may be a conglomerate of facts furnished by several persons. In any event, no attempt whatsoever was made during the trial to lay a foundation for its existence, in spite of the fact that Mrs. Bourne was cross-examined extensively and the defense knew that she had reported the invasion of her house to the police. We conclude that there is no evidence that the State concealed the report from defendants and we find no error in the fact that it was not produced.

Defendants argue further that the court erred in admitting evidence of other crimes involving possession, sale and use of narcotics which they state were not related to the issues involved in the indictment. This contention ignores the right of the State to prove motive for a crime regardless of whether or not it may disclose the commission

of other crimes even by a defendant himself. (*People* v. *Scheck*, 356 Ill. 56.) The test for admission of such evidence is whether it is so closely connected with the main issue that it tends to prove the accused guilty of the crime charged. (*People* v. *Tranowski*, 20 Ill.2d 11.) Here the sale and use of narcotics are part of one continuous narrative in which defendants are revealed as predators preying upon the weak, forcing them to take part in the sordid narcotic traffic, at first by promises of shared gain, then by threats and finally by the ultimate punishment of death for "shorting" them on the profits and perhaps "informing" to the police. Without reiterating the facts it is readily apparent that each item of evidence presented constituted a link in a chain of relevant circumstances connecting defendants with the decedent and Fiorenzo, furnishing a reason for and culminating in the death of Moschiano. We find no error in the admission of such testimony.

Defendants argue further that it was error to refuse to permit the jury to go outside the jury room to a parking lot and personally examine the car in which the murder occurred. The defense wanted the jury to see for itself how much space there was in the opening between the trunk lid and the chassis of the car through which Fiorenzo testified that he saw the stabbing. This request was made even though the defense had been allowed to use a cardboard model to show that the opening was no more than $1\frac{1}{4}$ inches. Further, the State had introduced evidence using an experiment to show what area could be seen through the opening to the rear of the car. The jury was therefore fully aware of the facts and able to assess the weight of Fiorenzo's testimony. The defendants presented no case in support of their argument, but in an annotation at 124 A.L.R. 841 it is stated that the granting or denying an order for such a view lies within the sound discretion of the trial court. Under the circumstances of this case it is

our opinion that no useful purpose would have been served by such a view and that the trial court did not abuse its discretion in denying such permission.

Defendants next contend that the trial court erred in excluding evidence that Durso had offered to take a lie-detector test and such ruling deprived him of his right to show a lack of consciousness of guilt. We cannot agree. Such offers have been uniformly rejected as having no probative value for the reason that an accused has nothing to lose by making the offer, as the result of the test, if unfavorable, would be inadmissible against him. 29 Am. Jur. 2d, Evidence, sec. 296. .

It is next contended that it was error to allow police officers to testify that on January 23 and January 24 they had kept Durso's house under surveillance looking for the yellow Pontiac. This is the car which had so often been described by many witnesses and in which the murder was alleged to have been committed. The argument is made that the sole purpose of this evidence was to prejudice the jury and create in their minds the image that these defendants were men of bad character and therefore likely to commit crime. This is a novel argument indeed. The purpose of such surveillance obviously was to locate the car. This was an important element in the police investigation which was finally accomplished and which formed another link in the chain, substantiating Durso's ownership and possession of the car. The fact that Durso did not appear to have the car after the crime when he had used it so frequently prior thereto and that he later disposed of it were certainly relevant facts and admissible.

Defendants finally contend that the prosecutor's argument was prejudicial in that he made it appear that defendants were being tried on an issue of narcotics rather than murder, and further that he impliedly commented on Durso's failure to testify. With respect to the first point, narcotics formed such an integral part of this case it would

be difficult to conceive of an argument that did not mention narcotics and the evil results flowing therefrom, this murder for instance. In any event, it is always proper to argue the evil results of crime, urge the fearless administration of the law, and denounce the accused's wickedness if such comments are based upon the facts in the record or may be fairly inferred therefrom. (*People* v. *Hampton*, 24 Ill.2d 558; *People* v. *Tanthorey*, 404 Ill. 520.) On the second point defense counsel in his opening statement had stated that they would show that the money left at Jimmie Green's tavern by Fiorenzo was a loan in connection with a barbershop, contrary to Fiorenzo's testimony that it represented proceeds from narcotics which he sold for Durso and which Moschiano was supposed to pick up and deliver to Durso. In his argument the prosecutor asked where that evidence was and did they prove it. This line of argument was not an implied comment on Durso's failure to testify. Proof of the statement could have been made by someone other than Durso. It is analogous to the failure of a defendant to produce an alibi witness and in such instances we have held that where a defendant injects into a case his activities with a witness ostensibly for the purpose of proving his innocence, his failure to produce such witness is a proper subject of comment. (*People* v. *Swift*, 319 Ill. 359.) Likewise here, failure to produce evidence on a material matter injected into the case by the defense gives rise to the right of comment by the prosecution.

We find the evidence of defendants' guilt clear and convincing beyond a reasonable doubt, and, there being no prejudicial error in the trial, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.