THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILSON WEST, Defendant-Appellant.

(No. 54060;

First District—December 10, 1971.

108

Gerald W. Getty, Public Defender of Chicago, (Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and James S. Veldman, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE ENGLISH delivered the opinion of the court:

*OFFENSE CHARGED*

Unlawful sale of narcotics. Ill. Rev. Stat. 1965, ch. 38, par. 22—3.

*JUDGMENT*

After a jury trial, defendant was found guilty and sentenced to a term of ten to twelve years.

*CONTENTIONS RAISED ON APPEAL*

1. The defendant was not proven guilty beyond a reasonable doubt.

2. The trial court committed reversible error in improperly restricting cross-examination of the State's addict-informer witness.

3. The trial court erred in the admission of evidence.

4. The prosecutor's conduct during the trial and in his closing argument was inflammatory and prejudicial.

5. The jury was improperly instructed, and irrelevant and prejudicial evidence was allowed to accompany the jury during its deliberations.

*EVIDENCE*

*Harry Smith,* for the State:

He is also known as Joe LaFayette and Jamaica. On February 22, 1967, he was a special employee of the Chicago Police Department, working with narcotic officers Daniels, Works, and Stanfield. He was convicted of petty larceny in 1947, larceny in 1948, possession of narcotics in 1953, failure to register his narcotics conviction when crossing the Mexican border in 1964, and, at the time of this trial, he was out on bond, charged with theft from the person. He had previously been arrested once for

robbery and once for carrying a concealed weapon. He first became addicted to narcotics in 1946 and was an addict off and on until January of 1967, consuming $65 or $70 of drugs per day. He claimed, however, that he had been off drugs for six or seven months prior to the time he testified.

On February 22, 1967, at 9:30 or 10:00 A.M., he saw Detectives Works and Daniels at 1121 South State Street. They took him to a men's room where he removed all of his clothes and was thoroughly searched. The detectives kept the personal effects found in his clothing. He was then given a slip of paper upon which were recorded the serial numbers of 28 one-dollar bills. He checked over the money and the slip, found them to correspond, and signed the slip.

He rode to the vicinity of 43rd and Calumet with the detectives. Carrying the $28, he went into Smitty's restaurant, sat down, and talked to someone. Through a large plate glass window which affords a view into the restaurant, he could see that Daniels was standing outside. About 10 or 15 minutes after entering the restaurant, defendant, whom he had seen before, came in and sat down. He did not see any other narcotics peddlers there. He joined defendant and asked him for some dope. Defendant said yes, and he gave defendant the $28. He had an argument with someone in the restaurant, and a police officer, McBoyd, threw him out. When he got outside, defendant was waiting for him. (He also testified that after he was thrown out, defendant remained in the restaurant, and he had to go back in and get him.) They left the restaurant together and walked to a spot near the corner of 43rd and Calumet, where defendant gave him a tin-foil packet. He then went to the police car and gave Officer Works the tin-foil packet, and continued walking on.

This was the first case in which he had testified as an informer. On this occasion, the police paid him for his participation in the sale. He also gets paid each time he appears in court. Two weeks prior to giving his testimony, he was attacked on the street, beaten badly, and called a "stool pigeon." He did not know if it was in connection with the instant case.

*Theodore Daniels*, for the State:

He is a detective in the narcotics unit, and on February 22, 1967, he was working with Detective Works. At 1:00 P.M., he saw Harry Smith at the Police Station at 1121 South State Street. He and Works took Smith down to a washroom where they searched him, found no narcotics, and kept his personal belongings. After recording the serial numbers of 28 one-dollar bills and obtaining Smith's signature for them, they took him in an unmarked police car to a place under the "L" structure between

42nd and 43rd Streets. Smith was then searched again before leaving the car and given the $28. A few minutes after Smith left, the witness followed him a short distance to a restaurant which Smith entered. He strolled by the restaurant, observed Smith talking to a number of addicts, and crossed the street. He was not able to see Smith at all times. He did see Smith being ejected from the restaurant by a police officer. Thereafter, Smith walked to the elevated structure and stood there for a few minutes before returning to the restaurant which he re-entered. Smith and defendant then came out, and were talking as they walked east toward Calumet Avenue. There, the witness observed an "exchange of hands" between Smith and defendant, but did not see anything pass. At this time, Smith and defendant were six or seven feet from the corner of 43rd and Calumet, and the witness was about 20 feet behind them.

Smith then gave a prearranged signal that a purchase had been made. The witness kept his eyes on defendant and Officer Works joined him. Defendant was talking to a number of people on the street during this time. After Works had field-tested the evidence, they arrested defendant three or four minutes later. He and Works then searched defendant, found 22 one-dollar bills and no narcotics on his person. The serial numbers of the bills were checked against the list signed by Smith and were found to correspond. At the narcotics headquarters in the police station, the witness and his partner rechecked the packet they had received from Smith, placed it in an envelope, inventoried it, sealed it, and then they both delivered it to the crime laboratory.

He occasionally gave Smith spending money, and believed that the State paid him as a witness. Since, at the time of the trial, he did not have the slip upon which the serial numbers of the bills had been recorded, he could not check the serial numbers of the bills offered into evidence against the ones which had been given to Smith.

*Lemon Works,* for the State:

He is a detective assigned to the narcotics unit. On February 22, 1967, he saw Harry Smith, with whom he had been acquainted for several years. He had worked with Smith for seven to eight months in connection with investigations of narcotics purchases. To the best of his knowledge, Smith was a narcotics addict on February 22, 1967. He saw Smith that morning and arranged to meet him in the afternoon. At that time he and Daniels searched Smith, retained his personal effects, had him compare the serial numbers on 28 one-dollar bills with the numbers on a sheet of paper, and, when they were found to coincide, Smith signed the list. Works retained possession of the money until after he and Daniels had searched Smith again, at which time they let Smith out of their unmarked car in the vicinity of 42nd and the elevated. He also

kept the sheet upon which the serial numbers of the bills had been recorded, but did not have it at the time of trial. He had conducted a fruitless search for it and concluded that it had been mislaid.

He remained in the car after Smith and Officer Daniels left, and waited there for 20 to 30 minutes until Smith returned and gave him a tin-foil package of white powder (People's Exhibit 5). He gave Smith some money and told him to meet them back at the police station. He then field-tested a portion of the white powder by mixing it with a vial of chemical which caused it to change to a certain color. This positive reaction to the test indicated the presence of narcotics. He then placed the packet in a manila envelope (People's Exhibit 3). Next, he went to 43rd and Calumet where he met Daniels, and they arrested defendant. They searched defendant and found 22 one-dollar bills. He immediately checked their serial numbers and found that they were all included on the prerecorded list. He and Daniels took defendant to the Vice Control Division headquarters at the Central Police Station.

Smith is paid a witness fee only when he comes to court. He is also given small amounts of money on occasion if he asks for it.

*Charles Vondrak,* for the State:

He is a pharmacist and police sergeant assigned to the Chicago Police Laboratory. On February 23, 1967, he examined a tin-foil package (People's Exhibit No. 5) which was inside a sealed envelope (People's Exhibit No. 3). The tin-foil package contained .10 grams of white powder, which he subjected to various chemical identification tests. In his opinion, the powder was diacetyl morphine hydrochloride, commonly known as heroin. He then placed the packet in an envelope (People's Exhibit No. 4) which he stapled and sealed. He placed that into its original envelope (People Exhibit No. 3), which, in turn, was placed in People's Exhibit No. 2. Exhibit Nos. 2 and 4 had been slit open subsequent to the tests he performed.

*Wilson West,* in his own behalf:

During the early afternoon of February 22, 1967, he was by himself in the Okay Restaurant having coffee and a hamburger. He saw a man named "Jamaica" (Smith) with whom he had a conversation. Smith asked him "where was it" and if he knew "where he could take off." He told him that he did, and to go around the corner. Smith asked him to go, and he told him to wait until he was finished.

While he was eating, Smith was "talking around," and the police asked him to be quiet and leave if he was not going to spend any money in the place. He gave the police a rough time, so they threw him out. Defendant remained in the restaurant and Smith did not return. After

defendant finished eating, he saw Smith and a man called "Soft Shoes." Smith asked defendant if he was going to take him "around there," so he agreed and took him around the corner to the Peaches House shooting gallery. They were followed by "Soft Shoes." He knew some of the people in the shooting gallery. Smith and defendant did not leave together. Defendant left first and went over to South Park and then to a restaurant where he had some pie and a malted. He then went to a tavern on Vincennes where he knew some people and where he had a beer. On his way home, at the corner of 43rd and Prairie, he was arrested and taken into a laundromat where he was searched. The officers found $22 on his person which he had been given earlier that day by his sister in the presence of two children. He was then taken to the 48th Street Station where he was held for a half hour before being taken to 1121 South State Street in a patrol wagon. Officers Works and Daniels did not take him to the second police station.

He has used narcotics, but is not an addict. He did not make a sale to Smith.

*OPINION*

■■ Defendant's first contention is that he was not proven guilty beyond a reasonable doubt. He argues that the 22 one-dollar bills found on defendant's person at the time of his arrest were not proven to be the same bills as the prerecorded funds given to Smith because of the absence at the trial of the memorandum upon which their serial numbers had been recorded. There was, however, the affirmative testimony of the two arresting officers that they had checked the serial numbers on the bills recovered from defendant against the list (signed by Smith) which they had in their possession at the time they arrested defendant, and found them to be included in the prerecorded funds. The $6 difference in the amount of money given to defendant and the amount recovered from him raises no question of significance as to the source of those funds. The testimony of Smith was that he had given defendant the $28 while they were inside the restaurant, a situation which afforded defendant ample opportunity to dispose of a portion of the money prior to his arrest. Furthermore, defendant himself testified that he had spent money at two restaurants and a tavern after his initial contact with Smith on the day in question.

■■ Defendant also argues that the testimony of Smith, as an addict and paid informer, was uncorroborated and, as a result, insufficient to form an adequate basis for conviction. Testimony from such a witness whose credibility is questionable, must be carefully scrutinized, but it is not to be disregarded if it is corroborated by other testimony or is itself

believable in view of all circumstances and the other evidence. (*People v. Hill*, 83 Ill.App.2d 116, 119-20; *People v. Hudson*, 97 Ill.App.2d 362, 366; *People v. Banks*, 103 Ill.App.2d 180, 186.) We find that Smith's testimony was corroborated by the money found on defendant's person and by the testimony of Daniels, who saw Smith's and defendant's hands meet, although he did not actually see the packet of heroin being exchanged. As to the credibility of the witnesses, that, of course, is essentially a matter for the trial court and will not be disturbed on appeal unless he evidence is so unsatisfactory as to raise a reasonable doubt of guilt.

■■ Defendant points to some five contradictions in the testimony of the prosecution witnesses, and urges that these discrepancies create a reasonable doubt. They concern the payments to Smith by the police, whether Smith was addicted to narcotics at the time of defendant's arrest, the length of time between the sale and defendant's arrest, whether the restaurant had seats, and whether the police officer who evicted Smith from the restaurant was in plain clothes or uniform. The effect of these discrepancies, which are immaterial, both individually and collectively, when considered in relation to the essentials of the crime alleged, is also a matter for the trial court's determination, and we find the point to be without merit. *People v. Lemon*, 70 Ill.App.2d 413, 416-17.

Also, while the testimony showed that there were addicts in the restaurant at the time of the controlled sale, thereby giving Smith an opportunity to obtain the narcotics from a source other than defendant, his testimony was positive that he had made the purchase from defendant, and, as we have seen, there was much corroborative evidence of this fact. *People v. Reddick*, 107 Ill.App.2d 123, relied on by defendant, is not in point. In that case, the trial testimony of the officer who had observed the controlled sale was at such variance with his testimony at the preliminary hearing, that it lost its effect as corroboration.

■■ Lastly, on this point, defendant says that there was insufficient proof that the packet of narcotics obtained from defendant by Works, through Smith, was the same one examined by Vondrak at the Crime Laboratory. We believe that a close reading of the testimony of Smith, Daniels, Works and Vondrak does establish a sufficient chain of possession in this regard, but, in any event, no question has been raised as to Works' possession of the packet on the street at the time when he submitted it to a field test. Even without the exact and detailed testimony of Vondrak, the kind of evidence introduced through the testimony of Works as to the presence of narcotics has been held sufficient. *People v.*

*Garcia,* 52 Ill.App.2d 481, 487-488. See also *People v. Clark,* 7 Ill.2d 163, 171, where the court said:

"Defendant also argues that doubt attaches to the question of whether the powder analyzed by the chemist was the same powder Baker purchased. While it is to be agreed that the foundation established for the chemist's testimony leaves much to be desired, the defect pointed out is not fatal in light of the fact that the testimony of officer Cassidy was sufficient to establish beyond a reasonable doubt that the powder purchased from the defendant field tested as a derivative of opium.

From a careful examination of the entire record, we are convinced that the evidence establishes the guilt of defendant beyond a reasonable doubt."

■■ We find, therefore, that the State presented sufficient evidence to support the verdict of the jury that defendant was guilty beyond a reasonable doubt.

Defendant's next contention is that the trial court committed reversible error by refusing to allow defense counsel to inquire into the home and work addresses of the informer Smith. The following exchanges took place on the cross-examination of Smith:

"Q. Where have you lived in Chicago? Where do you live now?

A. I won't tell you where I am living now, not you or anybody else. That's my business. Don't ask me that.

THE COURT: There has been an objection made. I will sustain the objection.

\*    \*    \*

Q. Where are you working? What is the address?

A. I decline to answer.

Q. What is the name of the place?

A. I decline to answer that.

Q. You just told me the name before.

A. I won't tell you, but I didn't tell you anything before, not where I worked at, not where I lived at.

THE COURT: He didn't answer that.

THE WITNESS: I won't tell you where I live nor where I work at."

The Supreme Court, in *Smith v. Illinois,* 390 U.S. 129, held that the restriction of cross-examination into a witness' address constituted reversible error in that case. The court, at page 131, said:

"\*    \*    \* When the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues

of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself."

In reaching this conclusion, the court relied in part on *Alford v. United States,* 282 U.S. 687, 693, where the court held that inquiry into the residence of the witness was essential to identify him with his environment.

After the Supreme Court decided *Smith v. Illinois, supra,* this court was directed to re-evaluate our earlier decision of *People v. Shaw,* 89 Ill. App.2d 285, "in the light of *Smith v. Illinois.*" (*People v. Shaw,* 394 U.S. 214.) We did so, and in our subsequent decision, *People v. Shaw,* 117 Ill.App.2d 16, 19-20, which quite similarly involved inquiry into the residence of a police narcotics informer, this court stated:

"We therefore interpret the Smith opinion as holding that the questions should have been answered because they did not involve self-incrimination, nor did they "harass, annoy or humiliate the witness." Alford, supra. In our opinion, the Smith court did not intend to require reversal in all cases failing to meet these Alford tests, regardless of other factual circumstances, but only in those cases involving convictions essentially dependent upon the credibility of the witness being cross-examined. We conclude, however, that this is that kind of case, and that the opinion in Smith is controlling of our decision."

See also *United States v. Garafolo,* 385 F.2d 200, 206—7; 390 U.S. 144; 396 F.2d 952.

■■ Recently, two decisions of the United States Court of Appeals for the 7th Circuit, (*United States v. Palermo,* 410 F.2d 468, 472—3, and *United States v. Varelli,* 407 F.2d 735, 750), in reliance upon the concurring opinion of Justice White in *Smith v. Illinois,* 390 U.S. 129, 133-134, held that a witness need not disclose his address if the prosecution has proved that if he were to do so the life of the witness would be in danger. For three reasons, we find that *Palermo* and *Varelli* do not control our decision in the instant case. First, decisions of Federal Courts other than the United States Supreme Court decisions are not binding on the courts of this state. (*People v. Stansberry,* 47 Ill.2d 541, 544.) Second, the basis of authority for *Palermo* and *Varelli* is a concurring opinion of one of the Justices of the United States Supreme Court in the *Smith* case, setting forth a proposition which was not incorporated in the majority opinion. We therefore feel bound to adhere only to the principles approved by the majority, unless and until the majority indicates acceptance thereof, which it did not do in the *Smith* case and has not done since, to our knowledge. Third, in granting the strong persuasive authority of *Palermo* and *Varelli,* we find no proof by the State that the informer's life in the

instant case would be endangered by the disclosure of his address. Further, the testimony the State did elicit from Smith concerning threats he had received were not shown to have been connected in any way with the instant case, and, in consequence, was introduced and used in a prejudicial manner, as we will discuss more fully below.

■■ Considering, as we do, that the testimony of Smith was essential to the conviction in this case, his credibility was a question of serious importance. We find, therefore, that, under the circumstances of this case, the trial court committed error in sustaining the objection to defense counsel's questions concerning the address of the informer witness.

Defendant points further to a number of other instances in which the trial court failed to direct the informer witness to answer questions, and defendant urges that these restrictions on cross-examination also warrant reversal. One of these exchanges, concerning persons the witness may have known in the restaurant, was as follows:

"Q. Did you see anyone in there that you knew?

A. Yes.

Q. Who?

A. Somebody whose name I do not care to mention.

Q. Did you see anybody else in there?

A. Yeah, I seen quite a few people in there.

Q. That you know?

A. Yeah.

THE WITNESS CONTINUING: At that time I don't think he was in there yet. I don't know anything about Soft Shoes. I don't know him, that's all I care to say about it.

Q. Do you know of him?

A. I decline to answer.

Q. Was he in the restaurant at the time?

A. Who?

Q. Soft Shoes.

A. I said I decline to answer anything concerning Soft Shoes whatever. I don't even—you know.

Q. In other words, you don't want to tell us anybody you saw in there, is that right?

A. No"

Answers to these questions could well have been material. Defense counsel was trying to determine whether the witness could have made a narcotics purchase in the restaurant from someone other than defendant. In addition, had the witness answered the questions, grounds for impeachment might have been uncovered, in light of the witness' later testimony that he had seen no narcotics peddlers other than defendant in the restaurant.

■■ Another exchange, in which defense counsel tried to elicit information concerning the witness' narcotics habit, was as follows:

"Q. You had a sixty-five dollar or a seventy dollar habit on the average from September until January?

A. Right.

Q. And you weren't working?

A. No.

Q. Well, did you maintain your habit by stealing?

MR. MONTELIONE: Objection.

THE WITNESS: I decline to answer how I maintained my habit.

MR. MONTELIONE: There is an objection.

THE COURT: Sustained."

The questions above were relevant to the credibility of the witness under the circumstances, and since, in refusing to answer the question, there was no claim of the privilege against self-incrimination, the State's Attorney's simple statement of an unspecified objection was erroneously sustained.

The trial court also erred in granting to the witness the discretion as to whether he would or would not answer questions. This, the court did by failing to instruct the witness to answer certain relevant questions concerning his activities with the police:

"DEFENSE COUNSEL: Q. Were you employed in any other cases prior to this case?

A. I don't know whether I should answer that question or not.

Q. Do you want to answer it?

A. I don't think I should, no, because I think it is irrelevant to what we are talking about.

DEFENSE COUNSEL: Instruct the witness to answer the question, your Honor.

THE COURT: If he doesn't—

THE WITNESS: I don't care to answer.

DEFENSE COUNSEL: I don't think he should determine the rules.

THE WITNESS: I think I should. I don't think you should be allowed to determine it, man, you know.

THE COURT: I am not going to instruct him to answer the question if he doesn't choose to answer.

THE WITNESS: I don't choose to answer.

DEFENSE COUNSEL: Is there any reason that you don't want to answer it?

MR. MONTELIONE: Objection.

THE COURT: Sustained.

\* \* \*

Q. Did they [the police] promise you anything if you helped them?

A. They promised me money. They would pay me.

Q. How much do they pay you for each one you do?

A. I refuse to answer.

MR. MONTELIONE: Your Honor, I object to the question.

THE WITNESS: I don't think that concerns you.

MR. MONTELIONE: I object to that as being a matter of privilege at this time.

THE COURT: Well, I will overrule the objection, but he has declined to answer the question."

■■■ Because the credibility of an addict informer is often so highly questionable, we have held that it is necessary for the trial court to exercise its discretion as to the limits of cross-examination "with more than ordinary liberality." (*People v. Soto*, 64 Ill.App.2d 94, 99.) For the purpose of exposing bias, the court should also allow a defendant the widest latitude in cross-examining such witnesses. (*People v. Soto, supra,* 99 (and cases cited therein).) We think the record amply illustrates that the trial court erred in abdicating its responsibility to assure defendant his right of searching cross-examination. The record discloses no reason why the witness should not have been required by the court to answer the questions set forth above.

■■■ Defendant's next contention is that he was prejudiced when the State was permitted to introduce testimony of the informer about a beating he had received without any evidence whatsoever connecting that occurrence to the cause on trial. Smith admitted that he did not know who attacked him or if the attack was in any way related to the instant case. The obvious inference, however, was that defendant, or someone on his behalf, had attempted to intimidate the witness. Evidence of a separate crime is admissible only under very limited and well-defined circumstances, none of which was present here. (See *People v. Hudson*, 106 Ill.App.2d 130, 138; *People v. Gambony*, 402 Ill. 74, 80.) The nature of the improperly admitted testimony in this case was such that we cannot say that it did not have a prejudicial impact upon the jury. *People v. Gregory*, 22 Ill.2d 601, 603—05. See also *People v. Jennings*, 91 Ill.App.2d 261.

■■ The prosecutor aggravated and amplified the prejudicial effect of this evidence when he referred to it in closing argument, saying to the jury:

"As a matter of fact, Mr. Smith has already been beaten up on one occasion. Who knows what will happen after this trial."

This comment is more serious than the type of inflammatory statement

which, while improper, has been held to have had no effect on the verdict. (See *People v. Acker*, 127 Ill.App.2d 283, 296; *People v. Trice*, 127 Ill.App. 2d 310, 319.) This was a conscious misrepresentation of evidence which the prosecution should not have introduced in the first place, thus exacerbating the other erroneous and prejudicial factors by which defendant was denied a fair trial. *People v. Beier*, 29 Ill.2d 511, 517.

We have considered defendant's other contentions and find them without merit.

The judgment of conviction is reversed and the cause remanded for a new trial.

Reversed and remanded.

DRUCKER and LORENZ, JJ., concur.