THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY GALLOWAY, Defendant-Appellant.

(No. 56960;

First District (1st Division)—October 1, 1973.

*Rehearing denied October 30, 1973.*

864

EGAN, J., dissenting.

James J. Doherty, Public Defender, of Chicago, (Harold A. Cowen, Assistant Public Defender, of counsel,) for appellant.

Bernard J. Carey, State's Attorney, of Chicago, for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

The defendant was found guilty by a jury of the unlawful sale of a narcotic drug (Ill. Rev. Stat. 1967, ch. 38, par. 22—3). He was sentenced to ten to twenty years imprisonment in the State Penitentiary. He appeals from that conviction on the following grounds: that the prosecutor's questions concerning the reporting of his business income were prejudicial, that he was deprived of a fair trial by the court's failure to give an instruction on an element of the crime charged and by the prosecutor's improper argument, that the restriction of cross-examination

of the State's informer denied him his sixth amendment rights, and that reversal is required because of false testimony by the informer and suppression of her criminal record.

On July 23, 1968, Augustus Stanfield, a Chicago policeman, arranged a controlled sale of narcotics with one Sylvia Carter (known by him to use several aliases), who was a drug addict and former prostitute. She told Officer Stanfield that the defendant would sell narcotics to her and, after making a phone call, she announced that she had arranged a $40 purchase. After she had been searched for narcotics by a policewoman, the woman was given $40 by Officer Stanfield, who had recorded the numbers of the bills. The woman was then taken by Officers Stanfield and Nance to the vicinity of a tavern where she said she had arranged by phone to meet the defendant. Officer Stanfield left the police car and positioned himself across the street from the tavern entrance. He observed the woman walk to the tavern entrance and signal someone inside. A man came out and the officer saw their hands come together twice. After making a prearranged sign that the sale had been made, the woman returned to the police car, where Officer Nance was sitting. She gave him a packet which he field-tested for heroin. The test was positive and he and Officer Stanfield then entered the tavern and arrested the defendant. The defendant had $172 on his person, $40 of which was the money given to the woman. The defendant testified that he had responded to a call from the bartender in the tavern, who placed an order for barbecued food from the store which the defendant owned, and that, after arriving at the tavern with his wife and delivering the order, the defendant remained inside until the police arrived.

The defendant first contends that a series of questions on cross-examination of him by the State constituted admission of evidence of a crime for which he was not charged. The challenged testimony consisted of questions as to the dollar amount of sales at the defendant's barbecue store. The defendant's responses indicated he kept no income records and he could only guess at the average sales figures. The crux of the defendant's challenge to this testimony is the following exchange:

"Q. Did you pay any income tax that year? [1968]

A. No, sir, the man that we got the barbecue place from was taking care of all that, because he owned the barbecue place before we got there, understand.

Q. All right, now, do you know that people pay income tax on money that they make?

A. Yes, sir.

Q. Did you make out any income tax returns for the year 1968?

MR. MISSIRLIAN: Your Honor, I am going to object.

THE WITNESS: The man that owned the tavern was taking care of that.

THE COURT: I am going to sustain the objection.

THE WITNESS: The one that owned the barbecue—

THE COURT: You don't have to answer.

MR. DRISCOLL: Q. You don't have any idea how much money you made that year?

THE WITNESS: A. No, sir, I don't.

Q. You kept no records?

A. No, sir, we didn't keep any records, because we was just starting.

Q. You started in September, 1967, is that right?

A. Yes, sir, he turned the barbecue place over to me and my wife, and he was paying the taxes, or whatever it was.

Q. All right, you have answered my question. Now, you had been in operation for ten months, is that right?

A. That's right.

Q. You had no records of any of the amounts of sales or transactions that you made in the ten months that you were in operation?

A. Only nightly, that is all I can say.

Q. I am sorry, I didn't hear what your answer was?

A. I say I could only answer that would be nightly, because we take in maybe $100 or $150, so we figured pretty good, that's all."

■■ The defendant claims that this is evidence of the crime of income tax evasion, the admission of which was so prejudicial as to require reversal. We cannot agree. In the first place, we find in the quoted testimony no indication that taxes were evaded. The defendant testified that someone else paid them. Even if it were possible to draw an inference of income tax evasion from the cross-examination, we would not find such an inference prejudicial. Such an inference could not have affected the result in this case in view of the overwhelming evidence of the defendant's guilt. (*People v. Scott*, 52 Ill.2d 432, 288 N.E.2d 478; *People v. Johnson*, 2 Ill.App.3d 1067, 278 N.E.2d 177.) The cases cited by the defendant do not compel a different conclusion.

■■ The defendant also challenges comments made by the prosecutor in closing argument on the ground that they prejudiced his case. In the first of these comments, the prosecutor accused the defendant of being a dope pusher. This, the defendant argues, was equivalent to accusing him of committing crimes other than the one charged, because it implies

that he sold narcotics to others. The contention is without merit. A single illegal sale of narcotics makes the seller a pusher, and that was the offense with which the defendant was charged.

■■ The defendant goes on to allege that the prosecutor's comments in argument were so inflammatory as to be prejudicial. Specifically, he refers to the characterization of the female informer as a walking corpse and of the defendant as a ghoul. The claim is made that the cumulative effect of these statements amounts to plain error, requiring reversal. But the general rule is that it is always proper to argue the evil results of a crime, urge the fearless administration of justice and denounce the accused's wickedness if such statements have a basis in the facts in evidence or may fairly be inferred therefrom. (*People v. Durso*, 40 Ill.2d 242, 239 N.E.2d 842.) Even if this test had not been met, the comments would not be grounds for reversal, in light of the overwhelming evidence of guilt. *People v. Davis*, 46 Ill.2d 554, 264 N.E.2d 140; *People v. Clay*, 1 Ill.App.3d 736, 274 N.E.2d 843.

■■ The defendant also contends that the prosecutor's comment on his failure to produce any witnesses from among the crowd in the tavern on the night in question was prejudicial. But such comment has been held to be proper where the defendant testifies as to his activities with a witness in order to show his innocence of the crime charged. (*People v. Durso*, 40 Ill.2d 242, 239 N.E.2d 842; *People v. Beck*, 133 Ill.App.2d 356, 273 N.E.2d 169.) Such is the case before us. Moreover, reversal is not required where such comment was not a material factor in the defendant's conviction. *People v. Nilsson*, 44 Ill.2d 244, 255 N.E.2d 432.

■■ The defendant next argues that failure to instruct the jury that knowledge of a violation of the law is essential to find one guilty of unlawful sale of narcotics was error. While it is true that failure to include knowledge as a part of the instructions was error (*People v. Mills*, 40 Ill.2d 4, 237 N.E.2d 697), it was only harmless error, since the evidence as to defendant's knowledge was so clear and convincing as to preclude a reasonable doubt of guilt. *People v. Truelock*, 35 Ill.2d 189, 220 N.E.2d 187.

The defendant cites a case in this court where reversal of a narcotic sale conviction was ordered on the ground that absence of a "knowledge" instruction raised a reasonable doubt as to the defendant's guilt. (*People v. Castro*, 1 Ill.App.3d 537, 274 N.E.2d 839.) But as the court pointed out, the doubt arose because the defendant's knowledge of the contents of the package he possessed was made a major question of fact. The defendant there contended he was only delivering the package and that he did not know its contents. The defendant here, on the other hand, never brought this issue before the court. He contends he never had the nar-

cotic in his possession. Hence, failure to instruct the jury as to the element of knowledge did not prejudice the defendant.

■■ The next argument put forth by the defendant is that the cross-examination of the female informer, Sylvia Carter, was so unduly restricted as to deny him his sixth amendment rights. The general rule is that the limits of cross-examination are set at the discretion of the trial judge. Reversible error, if any, must be based on an abuse of that discretion. (*People v. Clay*, 1 Ill.App.3d 736, 274 N.E.2d 843.) The point at which cross-examination was restricted after objection by the State, sustained by the court, was when the female informer was asked where she purchased narcotics to support her $14 a day habit. We find no abuse of discretion in the court's action. The question asked of an employed woman (she worked as a cook) as to the source of her narcotics (she admitted being an addict) was irrelevant to the case and had no bearing on her credibility as a witness. While the widest latitude should be granted in the cross-examination of an addict-informer (*People v. Soto*, 64 Ill.App.2d 94, 212 N.E.2d 353), it need not encompass the admission of irrelevant testimony. The question could only be relevant here if the police were the source of her drugs. Subsequent testimony in this case established that the witness never received drugs or other favors from the police.

The defendant urges us to apply the reasoning of a case in which reversal was ordered because the addict-informer was allowed not to answer questions concerning the method of sustaining his habit. (*People v. West*, 3 Ill.App.3d 106, 278 N.E.2d 233.) This is not the case before us. The court in *West* found reversible error in the sustaining of an objection to the question of whether the witness supported his habit by stealing. The habit was expensive, the witness was unemployed and he claimed no privilege for his refusal to answer. Questions as to his source of funds were relevant in establishing his credibility. The question in this case as to where the witness purchased her drugs could, as we have pointed out, be relevant only if the police were her source, and they were eliminated as a source in subsequent testimony.

The defendant's next argument is that he was prejudiced by suppression of the informer's names and criminal record and by her false testimony. There are three parts to this argument. First, the defendant contends that the informer perjured herself. Second, he contends that the State knowingly suppressed information that should have been revealed to the defendant. Third, he contends that this non-disclosure amounted to a deprivation of his right to confront the informer.

■ In support of the first contention, the defendant asserts that the female informer perjured herself because the names she gave in response

to a question did not include either her name given at birth or the name under which she had been arrested several times. The fact is, however, the defense counsel never asked her for her given name. When she was asked by the State about her aliases, she gave three besides the name Mary Lou Wilkes; on cross-examination she said that she had used several names, possibly more than the ones listed. Defense counsel did not pursue the matter further. Nor did he pursue further questioning about her arrest record after asking if she had been arrested by Officer Stanfield or by an officer who knew Officer Stanfield. We will not disturb the final judgment of the trial court unless there is clear and convincing evidence that testimony alleged to be perjurious was indeed, perjurious. (*People v. Bracey*, 51 Ill.2d 514, 283 N.E.2d 685.) There is no such clear and convincing evidence to support the defendant's argument.

The defendant next asserts that the State deliberately suppressed the felony record of the female informer, thus preventing the defendant from using it for impeaching purposes. The record discloses that the State did not reveal the informer's given name nor did it reveal the significance of the name "Sylvia Lake" under which the informer was arrested several times. But the record also reveals that the State witness, Officer Stanfield, as early as the hearing on the motion to suppress, gave "Sylvia Lake" as one of two of the witness's aliases, and there is no evidence that he or any State witness knew her given name. That the State did not reveal the significance of the name "Sylvia Lake" is not error, where the defendant has not shown that the information sought (her felony record) could not be obtained without knowing that significance.

■■ As to the suppression of the informer's felony record, the defendant asserts that he was thereby deprived of the opportunity to impeach her testimony. The State asserted that there was nothing in the witness' criminal history which could be used for impeachment. The police record of the informer was included in the record in this case after we granted the State leave to file it in a supplementary record. This procedure is in line with that suggested in special concurrence of Mr. Justice Stouder in a case involving the suppression of pretrial statements. (*People v. Wilkes*, 2 Ill.App.3d 626, 276 N.E.2d 761.) It is well-settled that only certain convictions are admissible to impeach a witness' testimony. (*People v. Jackson*, 95 Ill.App.2d 193, 238 N.E.2d 196.) There is no such conviction in the record pertaining to the informer here. Hence, we cannot find that the failure of the State to disclose it was prejudicial to the defendant's case.

■■ The defendant's third contention under this argument is that failure to reveal the informer's true name deprived him of his right to confront the witnesses against him. We find no merit in this argument.

The defendant was given the name the informer used, as well as several aliases. Over fifteen aliases appear in the criminal record presented by the State. Not knowing all of these names did not change the fact that the defendant knew who the informer was and where she lived and worked. He had every opportunity to cross-examine her on the stand. It cannot be said that he was deprived of any constitutionally protected right to interrogate the witness. The cases he cites for a contrary finding are inapposite to the facts before us.

For the reasons stated, the judgment is affirmed.

Judgment affirmed.

GOLDBERG, J., concurs.

Mr. JUSTICE EGAN dissenting:

I must respectfully dissent from the majority opinion. I am not persuaded that the evidence is so overwhelming that whatever errors may have occurred are harmless. The State's case essentially depends on the credibility of the informer, Sylvia Carter, and the police officer, Augustus Stanfield. The defense attorney in his closing argument focused entirely on their credibility and, I believe, correctly so from a tactical point of view. He pointed out what, it may be fairly argued, could be considered improbabilities in the testimony of Stanfield, namely, the ability to see the transaction on a dark street from over 60 feet away and the improbability that the transaction would have taken place out on the street. Stanfield had known her for over five years. He testified at the post-trial motion that he took her to the Grand Jury and had seen her on several occasions since the occurrence "on other matters." She had an "employee number" in their "confidential files." She first came to them in the first part of 1968 and was "an employee to help [them] with narcotics cases and [they] were trying to help her dispose of her habit." I point up the relationship between the police officer and the informer to answer the possible observation that, although her credibility as an addict informer is subject, as a matter of law, to careful scrutiny, Stanfield's is not. In view of the crucial nature of their credibility, I believe that error of constitutional magnitude occurred and that it was not harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18.

The date of the offense was July 23, 1968. A discovery motion was filed on August 6, 1970. As part of the motion the defense sought to examine the police record of Sylvia Carter. At the hearing on the motion the following occurred (where the record refers to "Sylvia Slater," it means Sylvia Carter):

"DEFENSE ATTORNEY: Secondly, I had made an earlier mo-

tion, a motion for the production of the arrest and conviction report of the informer in this case, Sylvia Slater, alias four or five names. I am not familiar with all the names. And I haven't received the copy yet as to her police report. I know she has a record, I know she has a conviction on that, and I would like to know if there are any provables to be used in impeachment if she takes the stand.

STATE'S ATTORNEY: Your Honor, I don't have that record. I presume Detective Stanfield knows that, what, if any, background she has. If the Court orders me to ascertain that, I shall furnish it. But I would submit that unless the Court orders me to do so, the People would object to doing that, the feeling that there would be anything of a non-provable nature would be improper for the defendant's use anyway. I will abide by whatever the Court—

THE COURT: A non-provable now?

STATE'S ATTORNEY: Yes, say any non-infamous crime or conviction she may have. I don't know if she does or doesn't.

THE COURT: Why don't we reserve this ruling until we find out the status of it. Reserve the ruling on that."

After the jury was selected the following occurred:

"DEFENSE ATTORNEY: First of all, I made a motion for the production of Sylvia Slater's criminal record. I believe I am entitled to that, if there are any provables, so far as for impeachment purposes. As of yet, I don't have any copy of a record, to examine that. And I feel that she may take the stand today. And I would like to have that copy before I begin my cross-examination.

STATE'S ATTORNEY: Your Honor, yesterday when counsel made this motion I objected, stating that it was a matter that could be subpoenaed, and unless the Court ordered me to do so, I would then turn it over. But until that order I felt it would not be proper. I would state for the record that Sylvia Slater, also known as Mary Lou Wilkes has no convictions which would be used to impeach her credibility as a witness under the statutes of the State of Illinois, and if the Court so orders, then I would furnish counsel with one tomorrow, but I couldn't do it today.

DEFENSE ATTORNEY: Just in response, if we were to subpoena the criminal record—

THE COURT: Wait, now just a minute. You are saying to this Court that she has no record that can be used for impeachment purposes?

STATE'S ATTORNEY: That's correct.

THE COURT: Well, that is counsel's position. Counsel wants it to be used for impeachment, is that correct?

DEFENSE ATTORNEY: That's correct.

THE COURT: Well, if there is no record, if the record does not contain any impeachment conviction, or convictions which can be used to impeach, well, then of course we have no problem.

DEFENSE ATTORNEY: *Well, there may be charges pending, to show motive. And I believe I am entitled to go into that.*

THE COURT: Well, you can ask her. The record won't show any pending charges, will it?

DEFENSE ATTORNEY: Sure it will. The record will show pending charges.

STATE'S ATTORNEY: It may or may not. It depends on the time the record was made up, and the relation to the time of any arrest. I am not talking about Miss Slater.

THE COURT: Are there any pending charges you know of?

STATE'S ATTORNEY: *I asked Miss Slater, and I asked the police officer, and I was told there were not.*

DEFENSE ATTORNEY: Another question, and this is a criminal case, were there any pending charges then at the time this occurred?

STATE'S ATTORNEY: Not that I am aware of. Mr. O'Gara and I were speaking to Miss Slater today, and I was told she has been arrested in the past, but there is nothing pending in the month of July, 1968, and that she has also no convictions of an infamous nature which can be used against her.

THE COURT: All right.

DEFENSE ATTORNEY: Well, that might satisfy the Court, but it doesn't satisfy me.

THE COURT: Well, what does counsel want?

DEFENSE ATTORNEY: A copy of the record.

THE COURT: Counsel is not entitled to a copy of the record except for impeaching purposes. Isn't that what you said?

DEFENSE ATTORNEY: That is correct.

THE COURT: And if there is no impeachable matter in that record, then what are we talking about?

DEFENSE ATTORNEY: *Well, I would like to look at that. Certainly I wouldn't go into it if I had the record."* (Emphasis added.)

Her complete record was never disclosed until the State filed its brief in this court and attached a copy. That record shows that Sylvia Carter, under the name of Sylvia Lake, was arrested for theft on April

26, 1971, and armed robbery on April 28, 1971. The armed robbery was stricken on the State's motion on May 10, 1971, but the theft charge was not stricken, also on the State's motion, until July 14, 1971. The trial began on May 28, 1971, and was completed on June 5, 1971. It would thus appear that at the time Sylvia Carter testified she then had the charge of theft pending against her. That fact could properly be brought to the attention of the jury. And it is inescapable that the trial judge and defense attorney were misled by the false information ascribed by the prosecutor to his two witnesses.

Her police record began in 1948 and contains over 80 arrests, most of them for prostitution or narcotics violations. There were some fines and jail sentences, although most of the arrests did not result in conviction. She did receive a five-year sentence for violation of the Federal Narcotics Law in 1957. From the date of Galloway's arrest until his trial, she had been arrested nine times. These resulted in a $25 fine and a six-month's supervision; in two cases leave to file was denied; all others were stricken on motion of the prosecution or dismissed for want of prosecution. In my opinion, the defense attorney could properly seek to determine if the actions of the prosecuting authorities, at least in those cases stricken or dismissed for want of prosecution, were in any way connected with her testimony against Galloway. Moreover, since the pending charges could have been shown, I believe that all previous convictions could be inquired into in determining whether or not she was aware that they could be considered in aggravation of her penalty. In the cross-examination of Sylvia Carter the following occurred:

"Q. Have you ever received any promises or favors from the police department for your testimony?

A. No, I haven't, not.

Q. Prior to today had you ever been arrested by Officer Stanfield?

A. I have never been arrested by Officer Stanfield.

Q. Well, have you ever been arrested on narcotics charges by members of the Vice Control Division who know Officer Stanfield?

A. No, I haven't, not."

This exchange is but one other example of how the failure to disclose her arrest record prejudiced the defendant. He would have been able to learn that, while she had not been arrested by Stanfield or members of the Vice Control Division who knew Officer Stanfield, she had been arrested between the arrest of Galloway and the trial by officers from the Second and Third Districts.

The Assistant State's Attorney insisted that the defendant was not en-

titled to a copy of the record; he expressly stated for the record that the witness had "no convictions which could be used to impeach her credibility as a witness under the statutes of the State of Illinois." When the defense attorney stated that there might be charges pending and that he would be entitled to inquire about them to show motive, the Assistant State's Attorney said: "I asked Miss Slater [Carter] and I asked the police officer, and I was told there were not." The defense attorney still insisted that he was entitled to look at the record and said he certainly wouldn't go into any matters he could not properly inquire about. I note this latter statement of the defense attorney in response to the argument that the attorney did not ask the witness whether she had any charges pending. It is reasonable to assume that, after a lawyer is told that there are no pending charges, he will not ask about them, lest he incur the displeasure of the trial judge.

I believe under these facts that we must charge the prosecution with the knowledge of the pending charges and of those disposed of between Galloway's arrest and trial. To hold otherwise would permit a prosecutor to deliberately insulate himself from any information that he could be expected to acquire by reasonable diligence and then be excused for his failure to learn of it. The trial judge put the decisive question squarely to the prosecutor: "Wait, now just a minute. You are saying to this court that she has no record that can be used for impeachment purposes?" And the prosecutor answered: "That's correct." If the State was content to rely on what Sylvia Carter and the police officer told it informally, the State should accept the consequences. In the recent case of *People v. Kucala,* 7 Ill.App.3d 1029, 1034, 288 N.E.2d 622, the court invoked *Brady v. Maryland,* 373 U.S. 83, and held that failure of the prosecutor to produce a statement of a witness was prejudicial error "irrespective of [the prosecutor's] good or bad faith."

In *Giglio v. United States,* 405 U.S. 150, an Assistant United States Attorney made a promise of immunity to a witness; the trial assistant was unaware of the promise; the Supreme Court reversed the conviction holding at page 154:

> "To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it."

It is not too much to expect a prosecutor to take more steps to insure the accuracy of his statements to a trial judge on a crucial matter than are disclosed by this record.

In *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, the defendant was found guilty of assault with intent to commit murder. At

his trial the prosecution introduced his revolver without disclosing at any time, to the court or to the defense, reports of ballistics and fingerprint tests made by the police department which cast grave doubt upon the defendant's involvement in the shooting. There was nothing to indicate that the State's Attorney had been told by the police of the existence of the reports. The court held that the effect of the non-disclosure was not neutralized because the prosecuting attorney was not shown to have knowledge of the exculpatory evidence and that failure of the police to reveal such material evidence in their possession was equally harmful to a defendant whether the information was purposely or negligently withheld.

While I am not suggesting that, in all cases where information favorable to a defendant is known only to some comparatively obscure person in the prosecutorial apparatus, failure to disclose should be imputed to the State, I believe that under the peculiar circumstances of this case, where the prosecutor was placed on notice of the possible existence of other admissible charges, simple justice requires that we reverse and remand this case for a new trial. See the collection of cases on this subject in 34 A.L.R.3d 16.

I also believe that the closing argument of the prosecutor constituted reversible error. He argued that the defendant was a "ghoul" that *feeds* —not fed—on living human beings; that "evil men such as this defendant who for greed will go out and be a parasite upon the bodies of *other* people." Other remarks of a similar nature are as follows:

> "But there are people, Jerry Galloway is one of them, out there *selling* narcotics, and that is why we are here, because we have to stop this. * * *. Those are the type of people who go out and use heroin. Those are the type of people who have to have a crutch. And Jerry Galloway gladly supplies that crutch for $40. That is all he cares about *other people*. All he wants is more money. And it is easy money. * * *. [T]hen cut Jerry Galloway loose, let him go right out that back door, right out into the street. He will be back at 61st and Prairie at Willa's Tavern. * * *. This man, Mr. O'Gara said, is a parasite on *society*. He is exactly that. He preys upon the weakest character, the weak in mind, *people* whose bodies are weakened as a result of this." (Emphasis added.)

All these remarks, I believe, were designed to convince the jurors that the defendant was in the business of selling narcotics. A similar argument was condemned in *People v. Lewerenz*, 24 Ill.2d 295, 300, 181 N.E.2d 99.

Last, I believe the refusal to permit the defense attorney to cross-

examine the informer about her source of narcotics was improper. (*People v. West*, 3 Ill.App.3d 106, 118-119, 278 N.E.2d 233.) This questioning was particularly pertinent in light of the post-trial testimony of Officer Stanfield that the informer was "an employee to help [them] with narcotics cases and [they] were trying to help her dispose of her habit." How they were helping her dispose of her habit was never disclosed.

For these reasons I conclude that prejudicial error occurred depriving this defendant of a fair trial and that the judgment should be reversed and the cause remanded for a new trial.