(No. 29070.—
JACK SCHNEIDERMAN, Appellant, *vs.* INTERSTATE TRANSIT LINES, INC., Appellee.

*Opinion filed Sept. 18, 1946—Rehearing denied November 14, 1946.*

WILSON, J., dissenting.

JOSEPH D. RYAN, and LOUIS P. MILLER, both of Chicago, for appellant.

Drennan J. Slater, and Thomas F. Hamer, both of Chicago, for appellee.

Mr. Justice Murphy delivered the opinion of the court:

Jack Schneiderman started this suit in the superior court of Cook county against Interstate Transit Lines, Inc., to recover damages for personal injuries sustained when the automobile he was driving collided with one of defendant's busses. A jury trial resulted in a verdict for plaintiff for $100,000. In response to a special interrogatory submitted at defendant's request, the jury found that the bus had been operated in a wilful and wanton manner. The court overruled defendant's motion for judgment notwithstanding the verdict, for a new trial, and its motion to require a remittitur and to set aside the answer to the special interrogatory. Judgment was entered on the verdict. On appeal the Appellate Court reversed the judgment without remanding the cause. We granted plaintiff's petition for leave to appeal.

The accident occurred at 5:20 on the morning of November 26, 1941, at the intersection of Oak Park avenue and Madison street in the village of Oak Park. The avenue extends north and south and Madison street east and west. Plaintiff drove his automobile south on Oak Park avenue toward and into the intersection of the two streets. Defendant's bus approached the intersection from the west. The collision occurred near the center of the intersection. Traffic at the intersection was regulated by stop-and-go lights located on each corner of the intersection.

Plaintiff's complaint consisted of two counts, the first containing six charges of negligence. The first charge was general negligence in the operation of the bus, and the second that the bus was being driven at a speed greater than was reasonable and proper, having regard for the traffic and use of the way. The third pleaded that there

was failure on the part of defendant to keep a reasonably careful lookout for traffic approaching the intersection from the north on Oak Park avenue. The other three charges of negligence were founded on alleged violations of duties arising out of the provisions of certain sections of the Uniform Act Regulating Traffic on Highways. Two of them were based on paragraph (a) of section 32 of the act. (Ill. Rev. Stat. 1945, chap. 95½, par. 129.) The first paragraph of section 32 provides that whenever traffic is controlled by traffic control signals exhibiting the words "go," "caution" or "stop," the colors shall be green, yellow and red. Paragraph (a) provides that green shall mean that vehicular traffic facing the signal may proceed straight through or turn right or left, unless a sign prohibits such turn. It further provides that such vehicular traffic shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited. The paragraph in reference to the color yellow directs that the color yellow shall mean caution when shown following green or go, and that "Vehicular traffic facing the signal shall stop before entering the nearest cross walk at the intersection, but if such stop can not be made in safety, a vehicle may be driven cautiously through the intersection." One of the specific charges was that defendant's driver failed to yield the right of way to plaintiff who had started to cross the intersection "while the color green alone was shown on the traffic control signals regulating southbound traffic, and who was lawfully within the intersection when the color green alone was thereafter exhibited on the signals regulating eastbound traffic." The second allegation of negligence was that defendant's agent "failed to yield the right of way to the plaintiff, who was unable to stop in safety and was proceeding cautiously through the intersection while the color yellow following green was shown on the traffic control signal regulating southbound traffic, and who was lawfully within the inter-

section when the color green alone was thereafter exhibited on the signals regulating eastbound traffic." The sixth charge of negligence was failure to give warning by horn as required by paragraph (a) of section 115 of the Uniform Traffic Act. (Ill. Rev. Stat. 1945, chap. 95½, par. 212.) The second count differed from the first only in that it charged the acts were committed in a wilful and wanton manner. Defendant's answer denied all charges of negligence and averred that plaintiff wilfully and wantonly drove his automobile against the red light signals into the intersection and that his own wilful act was the cause of the collision.

Defendant's motion for a new trial contained twenty assignments, including questions on weight of evidence, rulings on admission and rejection of evidence and the giving and refusing of instructions. It does not appear how many of such assignments were urged in the Appellate Court. It is stated in the court's opinion that "We find no material error in the rulings on evidence or instructions." It was also stated that the verdict should not be considered as so excessive as to warrant the setting of it aside on that ground.

Plaintiff's injuries affected his power to speak coherently and intelligently at all times and he could not make answer to any but simple questions. The Appellate Court held that plaintiff's mental condition was such as to render him incompetent to testify and that, therefore, none of his evidence should be considered. On the remainder of the evidence it was held that no cause of action was proved and that defendant's motion for a directed verdict, made at the close of the evidence, or its motion for judgment *non obstante veredicto,* should have been allowed. The questions presented here are as to plaintiff's competency to testify and whether the evidence was such as to require the allowance of defendant's motion for judgment *non obstante veredicto.*

The facts pertinent to the inquiry on plaintiff's competency are as follows: Plaintiff received chest and head injuries and two medical experts were called as witnesses to prove the nature and extent of such injuries. After the doctors testified, plaintiff was called as a witness by his counsel and in response to the questions propounded he gave a few, short, simple answers. He gave his name, residence, age, the day of the month and year on which the accident occurred. He was unable to state the month, but he fixed the location of the accident at the particular street intersection. He stated that there were traffic lights at the intersection, and the following questions and answers concluded his direct examination:

"Q. What street were you driving in when the accident happened? A. Oak Park and Madison street.

Q. Were there any traffic lights at Oak Park and Madison street? A. Yes.

Q. What direction were you going? A. South.

Q. Now what was the color of the light as you approached and reached the intersection? A. Green.

Q. What happened as you were going over? Tell the jury what happened? A. Green and amber, amber and bus struck.

Q. What happened as you were going over the crossing? A. I get hit.

Q. You got hit? A. Yes.

Q. By what? A. A bus.

Q. What do you next remember after that? A. I don't remember."

At no time during the trial did defendant object to plaintiff's competency. It is for the court to decide upon the competency of the witness and for the jury to determine what credit shall be given to his testimony under the various tests recognized by the law. (*People* v. *Enright*, 256 Ill. 221; *Kelly* v. *People*, 29 Ill. 287.) Except for the possible future course that this case may take, the question

of the competency of plaintiff might well be disposed of on the ground that the question was not raised by defendant in the trial court.

The cross-examination covers twenty pages of the record. It will be impossible to detail all the answers which reflect plaintiff's mental condition. A summary of it is that his answers to the questions that were first asked on cross-examination fixed the time when he left his home on the morning of the accident, that he went some place to eat but could not tell where, that he drove on to Oak Park avenue at Washington boulevard. Plaintiff stated that this intersection was one block north of the intersection where the collision occurred and that answer was correct. His testimony shows that there were traffic control lights at the Washington boulevard intersection, that he drove onto Oak Park avenue on the flash of the green light, that he turned south on the avenue, that he was driving 20 or 25 miles per hour. In reference to seeing the light at Madison street intersection as covered by his direct examination, it is as follows:

"Q. Now, you saw an amber light, did you? A. Yes.

Q. And where did you see the amber light? A. Green.

Q. No, I say, where were you when you saw the amber light?

A. About half a block.

Q. You were half a block north of the corner when you saw the amber light, were you? A. Yes.

Q. Now, was there any other light on besides the amber light when you saw it? Wasn't there a green and amber light on together when you saw it?

A. Amber.

Q. But was there more than one color light on when you saw it? Wasn't there both green and amber lights when you saw it?

A. No.

Q. Did the green light go off when the amber light came on?

A. Yes.

Q. At the time the amber light came on you were about in the middle of the block between Washington and Madison, were you? A. Yes.

Q. And you were going about twenty or twenty-five miles an hour then? A. Yes."

He further stated that the brakes on his automobile were good and when going at 20 to 25 miles per hour, he could stop his automobile in 3 or 4 feet. At first he stated he did not apply his brakes and when interrogated further he said, he put them on "right away." At times his answers lack consistency; that is, he would testify differently to the same question. At times his answers were incoherent and meaningless. A fair sample of such incoherent and meaningless testimony is set forth in the Appellate Court opinion (326 Ill. App. 1.) On the other hand, some of his answers are corroborated by other credible evidence.

Prior to the accident plaintiff was a strong, healthy, active individual, 37 years of age and had served six years on the police force of the city of Chicago. One of the physicians who cared for him immediately after the accident testified to a head injury but stated there was no skull fracture. Plaintiff was taken from the scene of the accident to an Oak Park hospital in an unconscious condition. The doctor stated that when the plaintiff arrived at the hospital he had lost his power of reason and speech and that physical restraint was necessary. He improved, and in about two weeks the doctors consented that he be removed from the hospital to his home. On being taken to his home he suffered an embolus, which the doctor testified was due to a traumatic injury of the chest, the left side of the brain became involved and there was a complete paralysis of his right limbs and side. He was taken to the Cook County Hospital, placed under the care of a neurologist

and in about five weeks he was removed to the University Hospital where he remained under the care of the same specialist for more than a year. The neurologist testified that for a period of two years following the accident there was slow but continuous improvement, but since then there had been no change in his mental condition. He stated that immediately after the accident he could not enunciate clearly, that he spoke in a jargon, but that after a lapse of time he had improved, and that it was apparent he understood the questions asked. The medical experts said that his speech was involved, his mental condition disturbed, he could not repeat simple phrases, his judgment was poor, he could not recall events or names correctly. At times he was confused on directions. He testified plaintiff could answer single word questions correctly but that on repeated questioning, he tired easily and became confused. This he said was typical of this class of cases known in the medical profession as aphasia, or the inability to coordinate thoughts and use words to express them.

The question of the competency of a witness and the credit to be attached to his testimony are closely related and should not be confused. The question of competency is for the court, and the weight to be accorded the testimony is for the jury. On the question of competency it is said in Wigmore on Evidence, 2d ed. sec. 501: "The tendency of modern times is to abandon all attempts to distinguish between incapacity which affects only the degree of credibility and incapacity which excludes the witness entirely. The whole question is one of degree only, and the attempt to measure degrees and to define that point at which total incredibility ceases and credibility begins is an attempt to discover the intangible. The subject is not one which deserves to be brought within the realm of legal principle, and it is profitless to pretend to make it so. Here is a person on the stand; perhaps he is a total imbecile, in manner, but perhaps, also, there will be a gleam of sense

here and there in his story. The jury had better be given the opportunity of disregarding the evident nonsense and of accepting such sense as may appear. There is usually abundant evidence ready at hand to discredit him when he is truly an imbecile or suffers under a dangerous delusion. It is simpler and safer to let the jury perform the process of measuring the impeached testimony and of sifting out whatever traces of truth may seem to be contained in it."

In *Truttmann* v. *Truttmann*, 328 Ill. 338, it was noted that there was a time when an idiot could not be sworn as a witness but that the test now is whether the derangement or feeble-mindedness is such as to make the person untrustworthy as a witness. The standard by which the competency of the witness may be ascertained is to determine whether the witness has the capacity to observe, recollect and communicate. If he has, he is competent and his mental deficiency is considered only insofar as it affects the weight to be given his testimony. *People* v. *Enright*, 256 Ill. 221; *Champion* v. *McCarthy*, 228 Ill. 87.

We have referred to the record to study the exact language employed by plaintiff in making his answers and, in view of such answers and in the light of evidence of medical experts as to the character of his mental ailment and the effect it has had on his powers of speech, we conclude that he was competent to testify and that the Appellate Court erred in rejecting his testimony *in toto*. The discrepancies in answers given to the same or similar questions to a great measure indicate lack of control of the power of speech and under the circumstances shown it was for the jury to determine which answers would be given greater weight. The Appellate Court cited *Conley* v. *People*, 170 Ill. 587, and *People* v. *Brothers*, 347 Ill. 530, to the proposition that the incompetency of a witness entirely destroys his testimony as evidence, and counsel refer to the same cases in their briefs. The general proposition that incompetency of a witness may be such as to render him

incompetent to testify is correct, but neither of the cases relied upon supports the proposition that plaintiff was incompetent. The cases cited were criminal actions and the discussions there in regard to incompetency of a witness were made in considering the question as to whether the defendant had been proved guilty beyond a reasonable doubt.

At the close of all the evidence, defendant moved for a directed verdict as to each count of the complaint. The motions made challenged the sufficiency of the evidence to establish a charge of ordinary negligence under the first count, and of wilful and wanton negligence under the second count. The answer to the special interrogatory which was to the effect that defendant's bus was operated in a wilful and wanton manner, and the general verdict in favor of plaintiff amounted to a finding that defendant was guilty of wilful and wanton negligence as charged in the second count. Defendant's motion for judgment notwithstanding the verdict therefore raises a question as to whether plaintiff proved a case of wilful and wanton negligence under the second count.

The statute (sec. 32(a) of the Uniform Traffic Act,) prescribes the rule by which traffic is moved at street intersections controlled by automatic stop-and-go lights. It directs that when the color green is exhibited, the traffic facing it shall move forward into the intersection. Such right of way, however, is subject to the provisions that the one advancing into the intersection with the green light "shall yield the right-of-way to other vehicle * * * lawfully within the intersection at the time such signal is exhibited." The second division of paragraph (a) prescribes the duty of the driver who approaches the intersection when the yellow light following the green is exhibited. It directs that when the yellow light flashes in front of him, he shall stop before entering the nearest cross-walk at the intersection "but if such stop can not be

made in safety, a vehicle may be driven cautiously through the intersection." The statutory provision is a reasonable traffic regulation intended to clear the intersection of cross traffic in a safe and orderly manner.

The traffic control lights at the intersection where the accident occurred operated on a sixty-second cycle, so that on Madison street the color green was exhibited for 35 seconds and red for 25 seconds, while on Oak Park avenue, the green was exhibited for 25 seconds and the red for 35 seconds. When the light was to flash from green to red, the yellow was exhibited as a warning signal with the green for three seconds, and when the change from red to green occurred, the yellow was exhibited with the red for one second.

Two police officers of the village of Oak Park arrived at the scene of the accident within a few minutes after it occurred. They testified the bus was standing east of the intersection on the south side of Madison street, headed in a southeasterly direction, that the front part of the bus had crashed into the right middle of the automobile, that the two vehicles were locked together. Their evidence shows that there was broken glass and other debris on the pavement in the intersection near the center line of Oak Park avenue and one foot south of the eastbound streetcar track. They testified that skid marks on the pavement extended from near the debris to the rear wheels of the bus, a distance of about 40 feet; that it was dark, the sky was clear, but they described the pavement as being damp.

There was an unobstructed view across the lot at the northwest corner of the intersection so that drivers approaching on either street could observe the traffic on the other. Plaintiff and C. W. Broughton, a passenger on the bus, were the only eyewitnesses called by plaintiff. The driver of the bus and six passengers testified for defendant. They gave various estimates of distances, rates of speed at which the vehicles were traveling and their relative location

to the street intersection when the traffic light changed colors. There is a conflict in the evidence on some points, but that involves questions of credibility of witnesses, weight and preponderance of evidence, none of which may be considered by a reviewing court on the allowance or rejection of a motion for a directed verdict or for judgment notwithstanding the verdict. However, on a review of such motions the court may take that evidence as true which is most favorable to plaintiff's cause of action.

The bus driver testified that plaintiff's automobile was 65 feet north of the north curb line of Madison street when he first saw it and that the bus was then west of the intersection on Madison street about the same distance. The witnesses' estimate of speed of plaintiff's automobile varies from 20 to 60 miles per hour. The speed of the bus is fixed from 25 to 40. The bus driver said the bus was traveling 20 to 25 miles an hour and the automobile at about the same speed. The Appellate Court said they were traveling at approximately the same speed, and that neither driver diminished his speed at any time prior to the collision. The driver testified the green light flashed for Madison street when he was 25 to 30 feet from the intersection. Some of the bus passengers estimated they were 60 to 70 feet from the intersection when they saw the green light. As previously stated, plaintiff testified the color of the light in front of him as he approached and reached the intersection was green.

This direct evidence and the reasonable inferences to be drawn therefrom left the question of the right of way across the intersection for the jury. Adopting the evidence of the bus driver that the two vehicles were traveling 25 miles per hour when each was 65 feet from the intersection, then each would travel such distance in less than two seconds of time. Thus, with the further evidence showing that the traffic lights changed colors while the vehicles were traveling within that space, there is evidence which

required submission of the case to the jury. It became a question for the jury to determine whether plaintiff entered the intersection on the green light or whether he entered it on the amber following the green or whether he drove into the intersection against the red light. If he drove into the intersection on the green light as he stated, then defendant's bus did not have the right of way. If he drove into the intersection when the amber light was exhibited with the green, then if plaintiff was in such position with his car that he could not safely stop, he had the right to proceed cautiously across the intersection and defendant was under the duty to allow the right of way to him. From all the facts and circumstances the trial court properly refused to direct a verdict for defendant or to allow defendant's motion for judgment notwithstanding the verdict.

There is evidence from which the jury might have found that defendant's driver exhibited a wilful and wanton disregard for the safety of others. The driver testified that he saw plaintiff's automobile for the first time when he was 65 feet west of the intersection and the automobile was a like distance north of the intersection. He stated that he looked to his right and when he saw plaintiff's automobile the second time it had traveled to almost the center of Madison street. On cross-examination he stated that it was three or four feet northeast of him, which was an instant before the collision occurred. His testimony is that he did not apply his brakes or try to stop the bus until he saw plaintiff's automobile the second time. If this evidence be accepted as true, then defendant's bus traveled from a point about 65 feet west of the intersection to a point near the center, a total of approximately 88 feet, without the driver taking heed of the approach of plaintiff's automobile or doing anything to check his speed or avoid a collision. He stated that when he saw plaintiff's automobile the first time 23 feet north of the traffic lights, plaintiff was traveling at about the same rate of speed as

the bus. Under such circumstances the jury might have found the bus was operated with a wilful and wanton disregard for the safety of others. Defendant says the bus driver had the right to assume plaintiff would obey the law and stop before entering the intersection. Such argument is based on the conclusive assumption that the bus driver had the right of way. As pointed out, the facts do not warrant such a conclusion.

Defendant requested, and the court gave, an instruction to the effect that if plaintiff was guilty of wilful and wanton negligence which contributed to his injury, he could not recover even though defendant might also be guilty of gross negligence. The propriety of giving such an instruction is not questioned, but defendant argues that plaintiff was guilty of wilful and wanton negligence as a matter of law. Enough has been said in reference to the approach of the two vehicles to the intersection, the speed they were traveling, and the change of lights, to show that there was evidence whereby a question as to the wilful and wanton negligence of plaintiff was a question for the jury.

A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. (*Brown* v. *Illinois Terminal Co.* 319 Ill. 326; *Heidenreich* v. *Bremner,* 260 Ill. 439; *Illinois Central Railroad Co.* v. *Leiner,* 202 Ill. 624.) The question whether a personal injury has been inflicted by wilful or wanton conduct is a question of fact to be determined by the jury. *Bernier* v. *Illinois Central Railroad Co.* 296 Ill. 464.

There was no error in the trial court's refusal of defendant's motion for judgment notwithstanding the verdict. The judgment of the Appellate Court is reversed, and in

view of the uncertainty as to whether the Appellate Court passed upon all the other questions involved, the cause is remanded to that court with directions to consider any other questions not previously considered and to either affirm the judgment or reverse it and remand the cause for a new trial.

*Reversed and remanded, with directions.*

Mr. JUSTICE WILSON, dissenting.