THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE RAINGE, Defendant-Appellant.

First District (4th Division) No. 1—87—0951

Opinion filed March 14, 1991.—Rehearing denied May 2, 1991.

434

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Maureen A. Harton, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial the defendant, Willie Rainge, was found guilty of murder, rape, and two counts of aggravated kidnapping. He was sentenced to concurrent terms of natural life imprisonment for murder and 30 years for each of the remaining offenses. He follows with this appeal.

In appealing his conviction and sentence, Rainge raises the following issues: (1) whether he was proved guilty beyond a reasonable doubt in that the testimony of witness Paula Gray was uncorroborated and so fraught with inconsistencies that it did not carry an absolute conviction of truth; (2) whether he was denied due process of law when the prosecutor failed to correct Gray's testimony that she was not receiving any benefit from the State for testifying against Rainge; (3) whether the trial court abused its discretion in refusing to inquire into Gray's competency to testify after the defense presented evidence of her prior history of acute schizophrenic reaction; (4) whether the trial court erred in permitting witness McCraney to testify about his fears for his family, threats he had received, and his multiple relocations by the State's Attorney's office; (5) whether he was denied a fair trial because of the prosecutor's improper argument; (6) whether he was prejudiced by irrelevant and inflammatory evidence regarding the families of the two decedents; (7) whether he was denied effective assistance of counsel; (8) whether his fourteenth amendment rights were violated when the trial court found that the defense had failed to establish a *prima facie* case of racial discrimination in the State's use of peremptory challenges during jury selection; (9) whether the code under which Rainge was sentenced, section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), is unconstitutionally vague; and (10) whether two 30-year sentences for aggravated kidnapping other than for ransom must be reduced to sentences of 15 years.

This is the second time defendant Rainge has been tried and convicted for the crimes connected with the murders of Larry Lionberg and Carol Schmal. His earlier conviction was reversed and remanded in *People v. Rainge* (1983), 112 Ill. App. 3d 396, 445 N.E.2d 535, *cert. denied* (1984), 467 U.S. 1219, 81 L. Ed. 2d 372, 104 S. Ct. 2667. In the instant trial below, Rainge was tried with codefendant Dennis Williams.

EVIDENCE AT TRIAL

In the early morning hours of May 11, 1978, Larry Lionberg was

working as an attendant at a gas station at 180th and Halsted Streets. Larry's fiancee, Carol Schmal, was visiting him while he worked. Larry was scheduled to work until 8 a.m. Two friends of Carol and Larry's dropped by the station around 1:45 a.m. They stayed for 25 to 30 minutes, and left at approximately 2:15 a.m. Around 6:30 a.m. of the same day, Clemente Moreles, the owner of the gas station, arrived at the facility. He noted that no one was on duty although there were cars waiting for service. He found the inside of the station in disarray; drawers were pulled out and items were scattered over the floor. Larry was nowhere on the premises. Moreles called the police.

Cook County sheriff's investigators David Capelli and Patrick Pasterick responded to the gas station at approximately 7:45 a.m. In searching an automobile that was parked behind the station, the officers found a woman's purse. Inside the purse were an Illinois driver's license in the name of Carol Schmal, a receipt for a man's wedding band, a receipt for a dress deposit, and a plain white envelope, marked "Money for car," which contained $125 in cash. Capelli and Pasterick went to the address noted on the driver's license, where they spoke with Carol's father. He gave them a picture of Larry and Carol together.

The following day, May 12, 1978, the bodies of Larry and Carol were found in an area of East Chicago Heights, where Cannon Lane dead ends near a creek. Larry's body was lying facedown near the creek. He had been shot three times: twice in the back of the head and once in the back. Carol's body was found on the second floor of a nearby abandoned townhouse. She too was lying facedown. She was naked from the waist down except for her socks, and she had been shot twice in the back of the head. All the bullets had been fired from the same weapon, although the State's expert could not determine what type of gun was used.

Sometime after Investigators Capelli and Pasterick arrived at the site where the bodies were discovered, they received a radio call from their dispatcher. The dispatcher told them that an anonymous tipster had phoned the police, claiming that the the killers were at the crime scene with a red Toyota. The officers turned toward the spectators at the scene and observed two males walking briskly toward a red Toyota. The two men, later identified as Dennis Williams and Verneal Jimerson, were taken to the sheriff's facility in Homewood. The red Toyota was inventory searched. Later, Kenneth Adams and Willie Rainge were also taken into custody, as were an orange Toyota and a yellow Vega. After further investigation in which the police inter-

viewed witnesses McCraney and Gray, all four suspects were charged in connection with the abduction and murder of Carol Schmal and Larry Lionberg.

### PAULA GRAY

On May 15, 1978, three days after the bodies of Larry and Carol were discovered, Paula Gray was taken into protective custody by the State's Attorney's office. On May 16, 1978, Paula was escorted to an appearance before the Cook County grand jury. Her testimony before the grand jury was essentially the same as that which she gave in the trial below from which this appeal follows. After testifying before the grand jury, Paula remained in protective custody overnight. She was then transported to her home in East Chicago Heights. She discovered that her family had moved in with the family of Dennis Williams, one of the suspects in the Schmal-Lionberg killing. Paula and her family remained with the Williams family throughout the ensuing summer. During that time, on June 19, 1978, Paula testified at a preliminary hearing which resulted in an information charging defendants Williams and Adams. At the preliminary hearing, Paula recanted her grand jury testimony by either failing to respond or responding, "That is a lie," when the prosecutor questioned her about statements she made to the grand jury. In response to cross-examination by the defense, Paula asserted that the police had given her pills and made her tell a lie.

Paula Gray was later indicted for her participation in the crimes committed against Larry and Carol. She was tried simultaneously with defendants Williams and Rainge, and represented by the same attorney representing Williams, although neither Paula nor her family paid for the attorney's services. A jury, separately empaneled to try Paula's case, returned a verdict of guilty, and Paula was sentenced to 50 years in the penitentiary. After serving six years of her sentence, Paula was granted a new trial. She was remanded to Cook County jail, where she remained for three years before coming to testify in this trial below. At the time she testified, Paula's new trial was still pending.

In 1986, prior to the trial below, the defense moved to bar Paula from testifying, alleging she was incompetent as a witness. In support of the motion, the defense presented the testimony of Dr. Robert Watkins, a family practitioner who had examined Paula on May 19, 1978, eight days after the murders. Dr. Watkins observed Paula to be anxious, withdrawn and agitated, but responsive after medication. She was treated and released. Three days later, Dr. Watkins found

Paula to be severely agitated and noncommunicative. He testified that her behavior was so bizarre that he admitted her into the hospital where she was administered Thorazine, a major tranquilizer. Paula resumed communicating and was released from the hospital on May 24, 1978. Dr. Watkins described Paula's condition as acute schizophrenic reaction, a mental disorder. Dr. Watkins did not testify as a psychiatric expert. He had not examined Paula again since 1978. The trial court denied the defendant's motion to bar Paula from testifying.

PAULA GRAY'S TESTIMONY

Paula Gray testified that in May of 1978 she lived with her family in an apartment at 1525 Hammond Lane in East Chicago Heights. On the evening of May 10, she was with her boyfriend of that time, Kenneth Adams. After he came over to her house to visit that night, they went outside and sat in his orange Toyota. They were listening to music in the car when Dennis Williams drove up in his red and black Toyota. Williams offered Paula and Adams some beer, which they declined. He sat in his car for awhile and then drove off. Eventually, Paula left Adams' car and returned to her apartment.

Later, Paula heard a "strange" noise from outside. She went to the apartment next door and looked out the window. She saw Williams' car in front of the building. Rainge, Williams, Jimerson, and Adams were standing around the car. Paula had known Adams, Williams, and Jimerson for about two months. She had also known the defendant Rainge, although for a somewhat shorter time. Williams spotted Paula and came over and grabbed her and told her to go with him.

Paula accompanied the group to 1528 Cannon Lane, an abandoned building. There, Paula saw two white people, a man and a woman, in the back seat of Williams' car. The man was short and had hair on his face, and the woman had brown hair. The entire group, including the white man and woman, entered the vacant building. Rainge remained downstairs with the man, and the rest of the group went upstairs into a back room. Williams gave Paula a Bic lighter and told her to keep it turned on. The lighter provided the only illumination in the room. Williams instructed the woman to remove her clothes and lie on the floor. The woman removed her outer pants and underpants. Williams, Adams, and Jimerson each raped the woman. Jimerson went downstairs and Rainge came upstairs. Rainge also raped the woman, after which he went downstairs again, and Jimerson returned upstairs. Everyone except Adams raped the woman a second time. Williams had the woman turn over on her stomach. He took a gun from his pocket,

placed it to the woman's head and shot her twice. The group then took the man to the creek where Williams instructed him to lie down on his stomach. Williams shot the man twice in the head. He handed the gun to Rainge, who shot the man in the back. Rainge returned the gun to Williams, who then threw the gun into the creek. Williams told Paula that if she told anyone what had happened that night, he would kill her and her family.

On cross-examination, Paula stated that while she had been afraid of Williams the night he threatened her, she had not been afraid of him when she returned from her interview with the police and found that her family was living with Williams' family. She also admitted that she was facing a new trial but denied expecting leniency in exchange for her testimony in the instant trial. Later, Paula stated that she was not aware that she was going to get a new trial. She testified that when she looked out the window after hearing the strange noise, she saw Williams' car stuck in the mud; however, the motor was not running and she did not see anyone around the car trying to push it out of the mud. Paula also stated that she was never seated in a blue Chevy on the night of May 10, 1978.

Paula's response to many of the defendant's cross-examination questions was that she did not remember. Among other things, Paula asserted that she did not remember staying in a hotel under police custody the night before she testified to the grand jury. She also did not remember appearing before the grand jury, or how she returned home afterward. Paula asserted that she did not remember statements she made at the preliminary hearing of June of 1978, even when the defense recalled those statements to her from a transcript of the proceedings. Similarly, Paula also responded "I don't remember" when questioned about her own trial and statements she made while testifying on her own behalf. Paula asserted that she did not remember having gone to trial. Paula's testimony at her own trial, like that she gave at the preliminary hearing of June 1978, contrasted directly with her testimony before the grand jury and in the instant trial below. At times during cross-examination in the instant trial, Paula asserted that she did not remember statements she had made on direct examination.

On redirect, Paula admitted that every time she had testified differently from her grand jury testimony, she was being represented by the same attorney representing Williams and Rainge. Paula's grand jury testimony, which was essentially the same as her testimony at trial, was introduced into the record as substantive evidence. Her

prior inconsistent testimony from the 1978 preliminary hearing and her own trial was admitted for purposes of impeachment.

## CHARLES McCRANEY

Charles McCraney was the witness who anonymously tipped the police that the suspects were at the scene of the crime the day the bodies were discovered. On the following day, he went to the police station and identified himself. At trial, McCraney testified that he had been reluctant to come forward because he was worried about the safety of his wife and children. In 1978, prior to testifying for the first time in this case, McCraney was relocated by the State's Attorney's office. The State paid $1,000 for McCraney's storage, moving expenses, and one month's rent. McCraney testified again in 1984, and he was again relocated. The State's Attorney's office purchased a car for him for $1,400. He testified that in 1984 he had been threatened. Prior to his testimony in the instant case, McCraney again received money for relocation.

## CHARLES McCRANEY'S TESTIMONY

McCraney testified that on May 11, 1978, he was living in an apartment at 1533 Hammond Lane with his wife and children. Hammond Lane is parallel to Cannon Lane. Except for his apartment and a couple of others, the buildings in that area were basically dilapidated. During the approximately two weeks that McCraney had lived at that address, he had noticed young people on the street sitting in cars, playing music, and racing their engines every night. He had also heard gunshots on four or five occasions.

In the early morning hours of May 11, 1978, McCraney was downstairs in his apartment working on a musical composition. Periodically, he would go upstairs to the back of his apartment and look out of the window overlooking Hammond Lane. He was worried about the possibility that two cars he had parked on the street might be stolen. Sometime before 3 a.m., McCraney saw a blue Chevrolet and a beige Toyota parked outside. People were sitting, playing music, and walking around. McCraney saw Paula Gray go back and forth between the beige Toyota and the Chevrolet. A few minutes later, approximately a quarter to 3 a.m., McCraney saw a red Toyota, the driver of which McCraney later identified as Williams, back in next to the beige Toyota. McCraney had seen Williams' car come and go from the area of Paula Gray's house on many previous occasions, including the night before. Ten or 15 minutes later McCraney saw a yellow Vega, driven by Willie Rainge, pull up next to the other cars. The drivers talked.

Williams moved the red Toyota under a streetlight, got out of the car and threw a rock, breaking the light. He then positioned the Toyota in the spot he had parked it in before. The defendant Rainge then entered Williams' Toyota, and the car headed east on Hammond Lane and disappeared from McCraney's sight.

After the car left, McCraney went outside to check on his car. Back in his apartment McCraney heard the sound of an engine revving. He looked out his front bedroom window and saw the red Toyota stuck in the mud in the courtyard area in front of his apartment. He then saw some people, including Kenneth Adams, run from the street in the back of his apartment to the courtyard area to push the Toyota out of the mud. McCraney also identified as being in the area at the time Verneal Jimerson, Paula Gray, and Willie Rainge. After the Toyota was released from the mud, it was driven onto a paved area in front of 1528 Cannon Lane, the building across the courtyard from McCraney's building. McCraney saw a group of six to eight people, including Williams, rush into the building. He did not see Paula Gray go into the building, nor did he see Williams pulling her by the hand. He did not see any white people in the group that entered the building. McCraney returned to playing music. After about an hour and a half he heard a gunshot from the courtyard area. McCraney testified that he pinpointed the relevant times because he had been watching the television program "Kojak," which was on about 2 a.m. Williams' car was coming and going during this time. The last time McCraney saw Williams' car, "Kojak" had been over for at least an hour and a half. He stated he had only one clock, which was located upstairs. The parties stipulated that on May 11, 1978, the television show "Kojak" aired from 12:40 to 1:51 a.m., Eastern standard time.

The next day, May 12, 1978, sometime before 11 a.m., McCraney was outside talking with the janitor when a young boy discovered a man's body by the creek. McCraney remained outside with a gathering crowd. Dennis Williams was standing near him and he heard Williams say in a joking way to some people, "Did you shoot those people? *** You should have seen them jump." Later, the body of a woman was found inside 1528 Cannon Lane. McCraney drove to a gas station on Lincoln Highway and called the police. He declined to give his name, but told the police that the people who had committed the crime were at the crime scene, as were their red and beige Toyotas. He later made a second call, reporting the license plate number of the beige Toyota. When McCraney came forward to the police the next day, he was shown a red Toyota and a beige Toyota. He told the investigators, "You got two of them."

The defense introduced McCraney's inconsistent testimony from two previous trials. In October of 1978, McCraney testified that he saw Paula and the others rush into the building at 2:15 or 2:30 a.m. He also stated that the last time he had seen the people he described was between 2:47 and 2:50 a.m. McCraney also testified that he did not have a clock at the time. He said he was able to pinpoint the time because after "Kojak" had ended he had gone through his 45-minute song once and was going through it a second time. In October of 1985, at Jimerson's trial, McCraney testified that he determined the time based on the television and two clocks, one of which was upstairs.

THE MEDICAL TESTIMONY

The Cook County medical examiner testified that, upon examining the body of Larry Lionberg, he found evidence of four bullet wounds. One bullet had entered the body from the back and exited from the chest. Two bullets entered the back of the head and lodged in the brain. Upon examining the body of Carol Schmal, the medical examiner found two bullet wounds. Both bullets entered the head from the back. Stippling, a condition compatible with gunshots fired at close range, was noted around both wounds. The victims were murdered where their bodies were found.

THE ISSUES

I

The defendant's first issue on appeal is that he was not proved guilty beyond a reasonable doubt because the testimony of the State's chief witness, Paula Gray, was so fraught with inconsistencies that it did not carry within it an absolute conviction of truth. Rainge points to both Paula's prior inconsistent testimony, and her manner of testifying in the instant trial, particularly her repeated response on cross-examination that she could not remember prior events, testimony, or the answers she had just given in her direct examination.

Rainge also regards Paula's testimony as uncorroborated. He asserts that McCraney's account was of no particular significance as he had heard gunshots in his neighborhood before, and had seen Dennis Williams and others gathered in the area around the apartments on numerous occasions. Rainge also cites to the time discrepancies between McCraney's testimony and his statements at previous proceedings. Rainge asserts that McCraney's testimony contradicts Paula's in several respects: she stated that she had remained seated in only one

car as she was visiting with the others, that the motor was not running on Williams' car and no one pushed it out of the mud, and that Williams pulled her by the hand into the abandoned building. Rainge also argues that McCraney saw neither the victims nor Willie Rainge enter the building in which Carol's body was found, that Rainge never made any incriminating statements, and that no physical evidence linked him to the crime.

■ Considering the evidence in the light most favorable to the prosecution, we do not believe that the State failed to sustain its burden of proving Willie Rainge guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) In the present case, Paula Gray provided a graphic and detailed account of the circumstances of the killings. The court instructed the jury that Paula's testimony as an accomplice was subject to suspicion and should be considered with caution. (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981).) The jury was also aware of Paula's prior inconsistent statements in which she denied knowledge or participation of herself or others in the crime. The determination of the credibility of the witnesses and the weight to be given their testimony are questions for the trier of fact. *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.

■ ■ The victims' bodies were found where and in the condition Paula had described. The forensic evidence indicated that the same gun was used to kill both Larry and Carol, and that the wounds were inflicted as Paula had described. Charles McCraney's testimony did not conflict with Paula's in a significant way. The time frame was essentially that which Paula described, as was the locale of the crime, and the identities and vehicles of the participants. Even where evidence is partially circumstantial, a conviction will not be overturned if the evidence tends to result in a reasonable and moral certainty of guilt. (*People v. Rainge* (1983), 112 Ill. App. 3d 396, 445 N.E.2d 535, *cert. denied* (1984), 467 U.S. 1219, 81 L. Ed. 2d 372, 104 S. Ct. 2667.) In the present case, we believe that the evidence was sufficient to convince a rational trier of fact of the guilt of defendant Rainge beyond a reasonable doubt.

II

The defendant's next argument is that the State failed to correct known false testimony of witness Paula Gray and, therefore, denied the defendant due process. (*People v. Martin* (1970), 46 Ill. 2d 565,

264 N.E.2d 147.) Specifically, Rainge refers to the testimony of Gray in which she responded to repeated questioning on cross-examination that she did not expect to receive leniency in her own retrial in exchange for her testimony against the defendant. It is Rainge's contention that, in fact, Paula had been promised that at least the murder charge against her would be dropped in exchange for her testimony.

The record reveals that in a response of the State to discovery filed in March of 1985, the prosecutor's office stated, "To Paula Gray if she testifies honestly, the State will drop the murder charge." When questioned in May of 1986 as to whether Paula had received any more offers of leniency, the prosecutor stated that the discovery answer could stand, although he qualified the wording of the answer by saying, "I think that's a stronger statement than is actually the fact." In February of 1987, prior to jury selection, the prosecutor characterized the State's discovery answer as "probably inaccurate," and stated further that "[t]here has been no communication of that." The prosecutor acknowledged communications between his office and Gray's counsel, but asserted that nothing concrete had been agreed to as of yet. When the court offered to strike the discovery answer, however, the prosecutor opted to let the answer stand in the event it did become fact. The trial court then announced that the parties were on notice of an oral change to the written discovery answer.

The defendant urges us to note a statement in Justice Clark's dissent in *People v. Jimerson* (1989), 127 Ill. 2d 12, 535 N.E.2d 889 (Clark, J., dissenting), *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288. Jimerson was charged in connection with the killing of Larry and Carol. His trial took place before the trial in the instant case. In his dissent, Justice Clark states that Paula testified against the defendant in exchange for the State's promise not to retry her for murder. Rainge also urges us to take judicial notice of a footnote contained in the State's brief on Jimerson's appeal to the Illinois Supreme Court. The footnote reads: "However, the jury did not know that the People had agreed to drop the murder charges against Paula if she testified against defendant, Williams and Rainge. This fact was discussed only in a sidebar." Rainge has appended a copy of the relevant portion of the State's *Jimerson* brief to his own brief on appeal.

■■ We recognize the principle that the State in the interest of fundamental fairness has a duty to ensure that the jury is fully and truthfully informed as to all matters within the knowledge of the prosecution. (*People v. Martin* (1970), 46 Ill. 2d 565, 264 N.E.2d 147.) However, we are unwilling, based on the sparse nature of the evi-

dence of record presented with respect to this issue, to conclude that the State did in fact breach its duty. We suggest that this issue is one that would more appropriately be dealt with in a post-conviction hearing wherein the evidence could be fully presented and reviewed. Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*

## III

The defendant's next argument is that the court abused its discretion in failing to hold a hearing to determine the competency of Paula Gray to testify. Prior to trial the defendant made a motion *in limine* to bar Paula Gray from testifying. In support of his motion, Rainge presented Dr. Watkins, a general practitioner, to testify about Paula's mental health. According to Dr. Watkins, who examined Paula approximately a week after the murders, Paula was suffering at the time from an incident of acute schizophrenic reaction. The doctor testified that Paula's family informed him that her medical history included mental retardation and a similar episode of schizophrenic reaction that had occurred a year earlier. The doctor stated that Paula's mental disorder would not abate without treatment. The doctor had not seen Paula again since the brief period he treated her in 1978.

The defendant contends that Dr. Watkins' testimony called Paula's competency into question in two respects: her ability to correctly receive sense impressions, and her ability to understand questions and express answers. (See *People v. Seel* (1979), 68 Ill. App. 3d 996, 386 N.E.2d 370.) The trial court denied Rainge's motion *in limine* and found that the defendant had failed to overcome the presumption that Paula was competent to testify. (See *People v. Spencer* (1983), 119 Ill. App. 3d 971, 457 N.E.2d 473.) The court also refused to allow Rainge to call Paula for questioning in connection with the hearing on the motion *in limine*.

We do not believe that the court abused its discretion in either case. The determination of whether a witness is competent is within the sound discretion of the trial court. (*Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 69 N.E.2d 293.) In determining the witness' competency, the court considers the witness' ability to receive correct sense impressions, recollect his impressions, understand questions and express answers, and appreciate the moral duty to tell the truth. (*People v. Seel*, 68 Ill. App. 3d 996, 386 N.E.2d 370.) Where a witness' mental capacity is called into question, the mental abnormality being inquired of must be relevant to attacking the witness' ability to perceive, record, recollect, or narrate. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §601.3 (5th

ed. 1990).) Otherwise, the question is one not of the competency of the witness, but the credit to be attached to his testimony. These two concepts are closely related and not to be confused. (*Schneiderman,* 394 Ill. 569, 69 N.E.2d 293.) The modern tendency is to abandon all attempts to distinguish between incapacity which affects only the weight to be given a witness' testimony, and incapacity which excludes the witness altogether. *Schneiderman,* 394 Ill. 569, 577, 69 N.E.2d 293.

■ In the present case, the only evidence the defense produced at the motion hearing was the testimony of a doctor, not qualified as a psychiatric expert, who examined and treated Paula briefly eight years before trial. Further, the doctor's contact with Paula occurred only a handful of days after she had witnessed the events leading to and culminating in the killings of Larry Lionberg and Carol Schmal. We do not believe that the court erred in determining that Paula was a witness whose mental incapacities, if any, could be given due weight by the jury hearing her testimony.

■ We also do not believe that the defendant had a right to participate in a preliminary examination of Paula in an effort to discredit her competency. The defendant has offered no authority to support the proposition that he had such a right. The court in *People v. Seel* (68 Ill. App. 3d 996, 386 N.E.2d 370) addressed a similar issue. The *Seel* court concluded that defense counsel's participation in a *voir dire* examination of the witness may be referred to by the appellate court in finding that the trial court did not abuse its discretion in determining a witness competent to testify. However, as the *Seel* court also noted, the converse proposition, that the trial court has abused its discretion if it does not allow defense counsel to participate in a preliminary examination, is not automatically true. In the present case, the defendant had ample opportunity at trial to examine Paula and attempt to discredit her testimony. We do not believe the trial court abused its discretion in refusing to also allow defense counsel to question Paula at the hearing on the motion *in limine*.

■ Finally, we also do not believe, as the defendant argues, that the inconsistencies in Paula's trial testimony, including her lapses of memory on cross-examination, illustrate that her competency was questionable. Inconsistencies such as those demonstrated in Paula's testimony relate to her credibility and not to her competency. (See *People v. Spencer* (1983), 119 Ill. App. 3d 971, 457 N.E.2d 473.) As such, we believe the trial court properly allowed Paula's testimony.

## IV

Rainge's next argument is that the trial court erred in permitting witness McCraney to testify about his fears for his family, his multiple relocations by the State's Attorney's office, and that he had been threatened. Rainge points out that none of these factors were shown to be connected to the defendant in any way. Upon questioning by the prosecution at trial, McCraney stated that he had been reluctant to come forward initially because he was worried about his wife and four daughters. He also related that the State's Attorney's office had on three occasions given him money to relocate. McCraney also stated that he had been threatened. No further testimony or detail was elicited on this point.

Rainge contends that McCraney's testimony as outlined was erroneous and prejudicial because it gave rise to an unfounded inference that McCraney's fear of coming forward and his subsequent relocations were due to the actions of Willie Rainge. The defendant cites to *People v. West* (1971), 3 Ill. App. 3d 106, 278 N.E.2d 233, in which the court found prejudicial error in the introduction of testimony of a witness who stated that he had been beaten prior to trial. There was no evidence linking the attack to the defendant West.

The State's response to Rainge's argument is that McCraney's testimony was properly introduced as it was probative of his bias or motive to testify, a question the prosecution anticipated would be explored by the defendant in an attempt to impeach McCraney. In fact, Rainge did not object to McCraney's testimony regarding his numerous relocations and inquired into the same area on cross-examination.

We believe that the testimony regarding McCraney's relocations on three occasions and the commensurate reimbursements from the State's Attorney's office were proper subjects of inquiry. The prosecution has a right to anticipate and deflect the impact of potential impeachment of its witness. (See *People v. Soskins* (1984), 128 Ill. App. 3d 564, 470 N.E.2d 643.) As for McCraney's statement that he was threatened, we do not believe that this statement in the context of a discussion related to his numerous relocations and the prompting for those moves was so prejudicial as to warrant a reversal.

## V

The defendant's next argument is that he was denied a fair trial because the prosecutor made improper argument to the jury. The prosecutor in beginning his closing argument to the jury characterized

the crime of which the defendant stood accused as "so evil and so horrendous that it has no parallel in the Criminal Justice System." The prosecutor also asserted that he thought the State had given "the most overwhelming account of a crime" that a courtroom had ever seen. Rainge contends that the prosecutor's characterization of events was not based on any evidence and was merely his personal opinion. Rainge argues that such comments are improper as unsworn testimony of the prosecutor. See *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.

The defendant also asserts that the State misstated its own burden of proof with the following remarks addressed to the jury: "[I]f you acquit the defendants *** [d]o it because you believe the police framed these men. Because that's what you would have to believe now." The defendant cites to *United States v. Phillips* (7th Cir. 1975), 527 F.2d 1021, for the proposition that prosecutorial statements informing the jury that they must believe that the government framed the defendant in order to acquit him constitute improper vouching for the credibility of the witness. The defendant admits that the aforementioned comments were not objected to at trial, but urges us to consider them under the doctrine of plain error (*People v. Sales* (1986), 151 Ill. App. 3d 226, 502 N.E.2d 1221), and to review them from a perspective of cumulative impact. See *People v. Whitlow* (1982), 89 Ill. 2d 322, 433 N.E.2d 629, *cert. denied* (1982), 459 U.S. 830, 74 L. Ed. 2d 68, 103 S. Ct. 68.

We do not believe that even taken as a whole, the prosecutor's remarks and characterizations prevented the defendant from receiving a fair trial. (*People v. Sales*, 151 Ill. App. 3d 226, 502 N.E.2d 1221.) The prosecutor may permissibly draw reasonable inferences from the evidence and respond to defense arguments. (*People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743, *cert. denied* (1990), 498 U.S. ____, 112 L. Ed. 2d 182, 111 S. Ct. 228.) In the present case, the seriousness and brutality of the crime depicted at trial were never at issue. The codefendant's attorney himself characterized the incident as a "most heinous event." Similarly, the prosecutor's statement that the State had given "the most overwhelming account of a crime" a courtroom had ever seen was responsive to the defense counsel's assertion that Paula Gray's testimony was uncorroborated. While perhaps hyperbolic, the statement was not substantially prejudicial. The defense also insinuated that Paula's testimony was the result of police coercion. We believe that the prosecutor's comments regarding a police frame-up can be construed as essentially an interpretation of the argument the defense was urging upon the jury.

We do not believe that the prosecutor's conduct in this case rises to the level of the misconduct in *United States v. Phillips*. In *Phillips*, the prosecutor told the jury they would have to find that he had conspired with the government to violate the defendant's civil rights. The *Phillips* court found that by placing himself in the "same conspiratorial nest" with the government agent, the prosecutor had vouched for the witness. (*United States v. Phillips*, 527 F.2d at 1025.) We believe that the comments of the prosecutor in this case were either responsive to defense counsels' arguments, or at the least not so prejudicial that absent the comments the verdict would have been other than it was. See *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

## VI

The defendant further argues that he was denied a fair trial by the prosecution's deliberate introduction of irrelevant and inflammatory evidence. The defendant cites to several instances at trial in which references of a personal nature were made about the two victims. Specifically, Rainge objects to the following testimony. When questioned about the contents found in Carol Schmal's purse, investigator Capelli stated that the police had found a receipt for a man's wedding ring, a receipt for a deposit on a woman's dress and a plain white envelope containing $125 in cash and marked "Money for car." Larry Lionberg's father testified that in May of 1978 Larry was 29 years old "because his birthday was in April." He also stated that the last time he had seen Larry alive was on his birthday, April 16. Larry's father was shown a picture which he identified as one of Larry and Carol taken on Larry's birthday. Carol Schmal's sister also identified the picture as one of Carol and Larry taken at Larry's birthday gathering. Carol's sister identified a leather jacket as one that her father had given to Larry because it was more Larry's style and he needed a coat during the cold. Carol's sister also testified that she had seen her sister's body at her wake on Mother's Day. The prosecutor in closing argument alluded to the picture of Larry and Carol, and recited the items found in Carol's purse.

Rainge asserts that this testimony was irrelevant, inflammatory, and elicited in a manner calculated to appeal to the jurors' emotions and mislead them into believing this evidence was material. (See *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202.) The State counters that the evidence of which the defendant complains was properly admitted as probative of issues before the jury. Specifically, the State asserts that the evidence of the victims' relationship to each

other explained why they were together at the gas station. (See *People v. Jimerson* (1989), 127 Ill. 2d 12, 535 N.E.2d 889, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288.) The evidence of the contents of Carol's purse, according to the State, tended to prove that Carol was abducted from the gas station. The contents of Carol's purse also prompted the police investigation into her disappearance. The State argues that the testimony that Larry was last seen alive on his birthday established the *corpus delicti*: that he had lived and died. The State contends that the identity of Larry's jacket was probative because it was the one he wore the night he was killed and was found on the body with a bullet hole through the back. Finally, the photograph of Larry and Carol was the one used by the police in their investigation, and the defendant agreed at trial to publish it to the jury.

We believe that such testimony as the fact that Larry was last seen on his birthday, that Carol's wake took place on Mother's Day, and that the couple had recently purchased a wedding ring may have been irrelevant. We also believe, however, that such testimony was simply incidental to the admission of proper evidence and not presented in a manner calculated to lead the jury to believe it was material to the defendant's guilt or innocence. (See *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) The testimony was confined to incidental references to the victims and did not, as in the case of *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202, suggest the depth of loss experienced by the family. Moreover, family members often relate to each other in terms of major life events and dates. There is no reason in this case to believe that the testimony volunteered by members of the victims' families was anything other than their spontaneous recollection of events.

## VII

The defendant also argues that he received ineffective assistance of counsel. Specifically, Rainge asserts that his attorney was ineffective in failing to ensure that the jury consider the prior inconsistent testimony of Paula Gray and Charles McCraney as substantive evidence. Further, Rainge argues that his attorney failed to preserve several trial errors for review.

At trial, the prior inconsistent testimony of Paula, given at her participation in the June of 1978 preliminary hearing, was admitted at the request of the defendant as substantive evidence. The defendant did not request that the testimony Paula gave at her own trial, or the

earlier trials, be admitted as substantive evidence. In her own trial, Paula had stated that the police had earlier forced her to lie and implicate the defendants. She also testified that she knew nothing of the offense and denied either her own involvement or knowledge of the involvement of the others.

The defendant's counsel also did not request that the prior inconsistent testimony of Charles McCraney be admitted substantively. McCraney had testified at an earlier trial that the last time he had seen any of the defendants was at 2:47 to 2:50 a.m. He later said it was at 2:30 or 2:45 a.m. McCraney also stated that when he saw the group of people enter the abandoned building it was at 2:30 or 2:15 a.m. At the trial below in the instant case, he indicated the time as 3:15 a.m. Rainge contends that the time element is critical as the victims were placed as still at the gas station as late as 2:15 a.m.

Rainge also refers to his counsel's participation in the jury conference as ineffectual. At the conference, the defense counsel failed to tender an instruction informing the jury that the prior inconsistent statement of Paula that had been admitted substantively could be properly considered as substantive evidence. The instruction that defense counsel did tender informed the jury that inconsistent statements could be used to weigh credibility only. Neither did the counsel offer an instruction limiting the jury's consideration of Paula's prior consistent testimony from the May of 1978 grand jury hearing. Rainge concludes that had his counsel taken the steps outlined, the jury could well have found that Paula had been coerced into implicating the defendant and that he was spotted in Chicago Heights by McCraney at a time when the victims were still at the gas station.

■■■ ■ Under the case of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, to establish ineffectiveness of counsel, the defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and so prejudiced the defense as to deny the defendant a fair trial. In the present case, we do not believe that there is a reasonable probability that but for counsel's errors, the results of the proceeding would have been different. With respect to the prior statements of Paula, we believe, as did the court in *People v. Jimerson,* that Paula's previous assertions that she knew nothing of the offenses and that she and the others were innocent were of no greater value to the defendant as substantive evidence than they were for impeachment. (*People v. Jimerson,* 127 Ill. 2d 12, 535 N.E.2d 889, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288.) At no time did Paula exculpate the defendants while inculpating others. The thrust of her incon-

sistent testimony was that she knew nothing of the crime. Further, the physical and forensic evidence and the testimony of McCraney for the greater part corroborated Paula's trial testimony below. As such, we do not believe that counsel's conduct prejudiced the defendant.

The decision of Rainge's counsel not to expand on Paula's earlier assertions of police coercion can be viewed as a tactical move, precluding the extensive police rebuttal that would certainly have been introduced in response. (See *People v. Jimerson*, 127 Ill. 2d 12, 535 N.E.2d 889, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288.) Even if not a tactic, we do not believe the counsel's action, or lack thereof, prejudiced the defendant. Similarly, we do not believe that the discrepancies in McCraney's testimony were so significant that the distinctions served any better purpose than to impeach the witness. As for those errors Rainge faults his attorney for failing to preserve, we have addressed the alleged errors elsewhere in this opinion and, as we have noted, we do not believe that the errors, if any, were so prejudicial as to deny the defendant a fair trial. *People v. Jimerson* (1989), 127 Ill. 2d 12, 535 N.E.2d 889, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288.

## VIII

The defendant next contends that under the fourteenth amendment as interpreted in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the trial court should have found that the defense made out a *prima facie* case of purposeful discrimination in the State's *voir dire* of the jury. During jury selection, after the defendant had exhausted his peremptory challenges, the prosecution exercised three successive peremptory challenges against black prospective jurors. The defense objected that the excusal of the three jurors was racially motivated and argued that, up to that point, the State had used 9 of its 15 challenges against blacks. The trial court ruled that the defense had not made out a *prima facie* case of racial discrimination under *Batson v. Kentucky*. The court noted that three black jurors had been seated on the jury. The court also asked the defense to state its reasons for challenging the three veniremen. The prosecutor offered, without waiving any other reasons, that the three excused jurors were all single, relatively young, and nonproperty owners, and therefore did not have substantial "roots in the community."

Citing to *People v. Andrews* (1988), 172 Ill. App. 3d 394, 526 N.E.2d 628, *aff'd in part & vacated in part* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, the defendant argues that regardless of how many black jurors were actually seated, the exclusion of some prospective

jurors based solely on race is grounds for discharging the venire and reinitiating the jury selection process. The defendant also contends that the trial court precluded the defense from making a record of the white jurors accepted by the State who possessed the same characteristics as the prosecutor gave for challenging the black jurors.

Under *Batson*, when the defense raises an objection alleging that the State has exercised a peremptory challenge based on race, the court must first determine whether the defendant has made a *prima facie* showing of discrimination. The defendant must show that the prosecutor used peremptory challenges to remove members of a cognizable racial group of which the defendant is a member and that these facts and any other relevant circumstances raise an inference that the prosecutor used the challenges to remove the veniremen on account of race. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 539 N.E.2d 1172, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203.) The relevant circumstances a trial court may consider in determining whether the defendant has made out a *prima facie* case include the following: whether there has been a "pattern of strikes against black" veniremen; the prosecutor's questions and statements during *voir dire* and in exercising his challenges; whether there has been a disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the jury; the race of the defendant and the victim; and the race of the witnesses. The court may not make an arbitrary ruling based solely on the number of blacks peremptorily challenged. A *prima facie* case is not established through mere numbers alone. *People v. Mahaffey*, 128 Ill. 2d 388, 413, 539 N.E.2d 1172, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203.

We do not believe that, under the circumstances of this case, the court's finding that the defendant failed to establish a *prima facie* case of discrimination was against the manifest weight of the evidence. The record does not disclose the level of black representation in the jury. At the time he made his objection, the defendant noted that "the venire is predominantly white." The defendant also pointed out that the State had thus far used 9 out of 15 of its exercised peremptory challenges to disqualify black veniremen. Of these, the defendant acknowledged that as to six the State had some justification. We also know specifically that the State had exercised three peremptory challenges against nonblacks. At the point defendant asserted his objection, 8 of 12 jurors had been selected. The court noted

that three blacks had been seated. After the defendant's objection was ruled upon, the State exercised one further peremptory challenge against a person whose race is unknown. Four more jurors were selected, one of whom we know was white.

Considering the circumstances, we do not believe the defendant established either a pattern of strikes, or a disproportionate use of peremptory challenges against blacks. By the defendant's own admission, the venire was predominantly white. Further, it appears from the characteristics of the jurors that the State did accept, that the State was seeking a juror who represented a combination of at least some of the following characteristics: homeowner or long-standing community member, married, 30 years of age or older, lack of criminal history, and lack of strong religious affiliation. While not all of the selected jurors possessed all of the characteristics, for the most part, they represented these classifications. On the other hand, the three veniremen whose exclusion the defendant objects to were all younger than 30, all nonproperty owners, and all unmarried. As the excluded jurors shared these characteristics in common, we do not believe that the three challenged jurors can be considered heterogeneous except as to their race.

As such, we agree with the trial court that the defendant failed to establish a *prima facie* case of discrimination in the State's exercise of its peremptory challenges. As we believe the defendant did not establish a *prima facie* case, it is unnecessary for us to consider the relevance of the court's request that the State provide explanations for the peremptory challenges in question. The trial court did not rely on these explanations in finding a *prima facie* case was not established, and neither do we.

## IX

The defendant also questions the constitutionality of section 5—8—1(a)(1) of the Unified Code of Corrections, under which he was sentenced. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) After conducting a sentencing hearing in which it heard evidence in aggravation and mitigation, the trial court found that Rainge was eligible for a sentence of natural life imprisonment under the Unified Code of Corrections. Section 5—8—1(a)(1) of the Unified Code of Corrections provides that if the court finds that the murder has been "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," the court may sentence the defendant to a term of natural life imprisonment. The defendant contends that in light of the recent United States Supreme Court decision in *Maynard v. Cart-*

*wright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, the wording of section 5—8—1(a)(1) of the Unified Code of Corrections is unconstitutionally vague.

 The issue of the constitutionality of section 5—8—1(a)(1) was addressed by the Illinois court in *People v. Barnhill* (1989), 188 Ill. App. 3d 299, 543 N.E.2d 1374. The *Barnhill* court did not consider *Maynard* dispositive as the statute under consideration in the *Maynard* decision involved the death penalty. The court in *Barnhill* reasoned that capital punishment cases are a "separate entity" from other cases. (*People v. Barnhill*, 188 Ill. App. 3d at 309, 543 N.E.2d at 1380.) The *Barnhill* court concluded, and we agree, that section 5—8—1(a)(1) of the Unified Code of Corrections is not unconstitutional on its face.

 Like the *Barnhill* court, our concern in the present case is whether section 5—8—1(a)(1) was unconstitutional as applied. We do not believe it was unconstitutionally applied. The defendant has not alleged that his conduct was not exceptionally brutal or heinous and indicative of wanton cruelty. The evidence in this case indicates that Larry and Carol were innocent and random victims. Carol was brutally raped repeatedly and then killed with cold-blooded calculation. The assault and murder of Carol apparently took place within earshot of Larry, who was then murdered with equal dispassion. Under the circumstances, we believe the court properly determined that the defendant's actions fell within the behavior described under section 5—8—1(a)(1) of the Unified Code of Corrections.

## X

 Rainge's final argument is that his two 30-year sentences for aggravated kidnapping other than for ransom must be reduced to the maximum permissible sentences of 15 years. The State agrees that the sentences should be modified and it is so ordered. For the reasons stated above, the ruling of the trial court is affirmed as modified.

Affirmed as modified.

JOHNSON and McMORROW, JJ., concur.